**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

       Plaintiff,

  v.

PETER TOWNSLEY,

       Defendant.

_____/

No. C 10-00428 CRB

**ORDER RE LOSS CALCULATION**

On February 22, 2012, pursuant to a Rule 11(c)(1)(A) & (B) plea agreement with the government, defendant Peter Townsley entered guilty pleas to Counts Two and Four of the superseding indictment, each of which charges a mail fraud in violation of 18 U.S.C. § 1341. Plea Agreement Dkt. 100.  In pleading guilty, Townsley admitted that from approximately April 200 through December 2006, he engaged in a scheme to defraud customers of his organic fertilizer manufacturing business, California Liquid Fertilizer ("CLF"), by (1) falsely representing that the ingredients in CLF's fertilizer, Biolizer XN, were fish, feathermeal, and water when that was not true and that instead Biolizer XN contained chemicals prohibited for use in organic farming, and (2) falsely representing that the formulation of Biolizer XN had been approved by the Organic Materials Review Institute for use in organic farming.  Plea Agreement at ¶ 2(e)-(j).  Townsley admitted that CLF's gross revenue from the sale of Biolizer XN during that time period was between $6.5 million and $6.9 million. Id. ¶ 2(k).

As part of the plea agreement, the parties agreed to some aspects of the sentencing

guidelines calculations.  Id. ¶ 7.  However, the parties did not reach an agreement as to the methodology that should be employed for calculating loss pursuant U.S.S.G. § 2B1.1.  The Court ordered the parties to submit legal memoranda on the proper methodology for determining loss based on the facts present in this case.  The Court held two hearings, and requested supplemental briefing from the parties on the issue.  The Court now resolves the issue of the proper method for calculating loss in this case, and determines the proper loss calculation number for sentencing purposes.

## I.       FACTUAL BACKGROUND

### A.       Federal Regulatory Framework for Organic Agriculture

Congress established federal authority over organic agriculture production and handling with the passage of the Organic Foods Production Act (OFPA) in 1990.  Congress passed the OFPA in order to establish uniform national standards for the production and handling of foods labeled as "organic" and "to assure consumers that organically produced products meet a consistent standard."  7 U.S.C. § 6501.2  In addressing "national standards for organic production," the OFPA specifically included regulation of materials that farmers applied to the soil such as fertilizers:

> To be sold or labeled as an organically produced agricultural product under this title, an agricultural product shall —
>
> (1) have been produced and handled without the use of synthetic chemicals, except as otherwise provided in this title;
>
> (2) except as otherwise provided in this title and excluding livestock, not be produced on land to which any prohibited substances, including synthetic chemicals, have been applied during the 3 years immediately preceding the harvest of the agricultural products; and
>
> (3) be produced and handled in compliance with an organic plan agreed to by the producer and handler of such product and the certifying agent.

7 U.S.C. § 6504 (the word "and" between sections 2 and 3 was added by amendment in 1991) (emphasis added).

The OFPA granted the Secretary of Agriculture ("the Secretary") the broad authority to issue regulations to implement the Act; establish an organic certification program for producers of agricultural products that are produced using organic methods as provided

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

for in the Act; and implement the organic certification program through "certifying agents." 7 U.S.C. §§ 6503(a) & (d), 6521(a). "Certifying agents" are defined in the OFPA as private entities or state officials who are accredited by the Secretary for the purpose of certifying that a farm is producing agricultural products in a manner that fully complies with the provisions of the national program. 7 U.S.C. § 6502(3). California Certified Organic Foundation, also known as CCOF, is one such entity operating in California; it has been a USDA-accredited certifying agent since 2002. Lewin Decl (dkt. 44) ¶ 2. Also as part of setting national standards for organic agricultural production, the OFPA required the Secretary to establish a "National List"of substances that farmers were allowed to use, and were prohibited from using, in production. 7 U.S.C. § 6517.

As required by the OFPA, in 2001 the USDA established the National Organic Program. The regulations establishing the National Organic Program (NOP) and all facets of its operation are found at 7 CFR Part 205, effective 2/20/2001 ("the NOP regulations"). The NOP regulations issued by the USDA established "national standards for the production and handling of organically produced products, including the National List of substances approved for and prohibited from use in organic production and handling." 7 CFR Part 205, Final Rule With Request for Comments, Summary. While fertilizer manufacturers such as Defendant's CLF were not directly subject to the NOP regulations, the fertilizers that organic farmers were permitted to apply to their soil were subject to regulation. Therefore, Defendant would not have been able to market his fertilizer to organic farmers unless he could satisfy them and the certifying agents who certified farms as NOP-compliant that his product fully complied with the NOP regulations.

The penalties and financial repercussions for using a prohibited substance as a fertilizer were, and remain, potentially severe. The NOP regulations provide that any operation that knowingly sells or labels a product as organic, except as in accordance with the OFPA, is subject to a civil penalty of up to $10,000 per violation. 7 CFR § 205.100(c)(1). Furthermore, the regulations provide that any field or farm parcel used to produce an organic crop must have been managed in such a way so that it had "no prohibited

**United States District Court**
For the Northern District of California

substances, as listed in § 205.105 [which references the National List] applied to it for at least 3 years prior to harvest of the crop." 7 C.F.R. § 205.202(b).  In addition, producers of organic agricultural products "must not use . . . any <u>fertilizer</u> or composted plant and animal material that contains a synthetic substance" unless that synthetic substance is specifically allowed on the National List.  7 CFR § 205.203 (emphasis added).

The NOP regulations provide that, as a general rule, all natural (non-synthetic) substances are allowed in organic production and all synthetic substances are prohibited.  <u>See</u> NOP website, Background Information; Ex. 2 ¶ 3.  The National List of Allowed Synthetic and Prohibited Non-Synthetic Substances ("the National List") contains the specific exceptions to the rule.  7 C.F.R. § 205.601. Ammonium chloride and ammonium sulfate, the substances which Defendant has admitted using in Biolizer XN from April 2000 through December 2006, were not – and are not – allowed synthetic substances.  <u>Id.</u>; <u>see also</u> Plea Agreement at 2(g) & (h).

As with many regulatory systems, enforcement of the NOP regulations is accomplished through inspection, review, and certification. To a large extent, the effectiveness of those efforts depends on the candor and honesty of the participants in the system.  Pursuant to the NOP regulations, farmers who wish to market their products as "organic," must subject their operations to inspection on an annual basis by USDA-accredited certifying agents.  These certifying agents, also known as certifiers, act as the NOP's agents for enforcing and implementing the national regulations.  Lewin Decl. ¶ 4; McEvoy Decl. (dkt. 45) ¶ 4.

The NOP regulations require organic farmers to establish, implement, and maintain an "organic production system plan," which must include a list of each substance, such as a fertilizer, that is used in the farming operation.  7 C.F.R. § 205.201; § 205.400.  During annual on-site inspections, the certifiers are required to verify the information in the farmer's organic production plan and ensure that "prohibited substances have not been and are not being applied to the operation . . . ."  7 C.F.R. § 205.403(c).  The integrity of this system relies in part on farmers being honest about what substances they are using in their

United States District Court
For the Northern District of California

1  agricultural production. The farmers, in turn, must rely on the honesty of fertilizer

2  manufacturers in reporting exactly what ingredients are contained in their product. Even

3  though ingredients in a fertilizer may be listed on the product's label, some manufacturers of

4  formulated brand name fertilizers are not willing to disclose the specific formulas for their

5  products to farmers or certifiers because they consider that information confidential

6  proprietary information. Lewin Decl. ¶ 5; McEvoy Decl. ¶ 8. However, if the manufacturer

7  is not willing to disclose information about what ingredients are in its product, there is no

8  way for the farmer or certifier to know that the product complies with the NOP regulations.

9  Id. Because of the financial risk that accompanies a violation of the NOP regulations,

10 farmers would not be willing to use a product unless the farmer could be assured that the

11 product would be approved by certifiers during annual inspection and certification. McEvoy

12 Decl. ¶ 8. This is where the Organic Materials Review Institute (OMRI) fits into the federal

13 framework for organic agricultural production.

14       OMRI, which was founded in 1997, is a non-profit organization the "primary mission"

15 of which is "to provide professional, independent, and transparent review of materials and

16 compatible processes allowed to produce, process, and handle organic food and fiber." See,

17 OMRI Operating Manual, 6-2000 ("OMRI Man."), Govt's Exs. in Support of Opp. to Mot. to

18 Dismiss Counts 9 & 10 (dkt. 43-1) at 115.4. In OMRI's Operating Manual, which is

19 provided to every manufacturer that utilizes OMRI's services, OMRI states: "OMRI assists

20 the organic community by performing the necessary research and information dissemination

21 to allow certifiers, growers, handlers, processors, and suppliers to make decisions about the

22 status of generic materials and brand name products." Id. Further, "Maintaining consumer

23 confidence is essential for continued growth and development of the organic industry. . . .

24 OMRI is dedicated to providing highly competent and scientifically defensible technical

25 review process based on considerations of human health and the environment established by

26 the U.S. Organic Foods Production Act. OMRI requires full disclosure of verifiable

27 information." Id. (emphasis added).

28       OMRI acts as a middle-man in the organic agricultural system. It analyzes

5

United States District Court
For the Northern District of California

information provided by a manufacturer such as CLF in order to determine whether the

ingredients in the product and the method by which it is produced fully comply with NOP

regulations.  Lewin Decl. ¶ 6.  It also provides a means by which manufacturers can reveal

their product specifications and subject them to review, and at the same time maintain the

confidentiality of proprietary formula information.  McEvoy Decl. ¶ 8.  Finally, OMRI

provides convenience.  Rather than having to reveal its ingredients and formula to every

farmer and certifying agent and convince each that its product fully complies with the NOP

regulations, a manufacturer can use the fact that OMRI has reviewed and approved

its product as a means of conveying to all interested parties that a specific product fully

complies with federal regulations.

OMRI provides this service to product manufacturers for a fee.  OMRI Man. at 118-

19; Lewin Decl. ¶ 6.  In order to have a product reviewed, a manufacturer must go through a

detailed and comprehensive application process, which includes reading OMRI's current

operating manual; reviewing OMRI's current list of prohibited and allowed materials;

providing detailed information about the product to be reviewed, including technical

information, manufacturing processes, and flow charts; and signing an application stating

that the applicant agrees to comply with OMRI's policies, as contained in its current manual.

OMRI Man. at 116- 17.  If a multi-ingredient product, such as Defendant's Biolizer XN, is to

be reviewed, the applicant is required to disclose "all of the ingredients."  Id. at 132.

(emphasis in the original).

OMRI reviews the ingredients to determine if they are NOP-compliant, and therefore

meet federal organic standards. While it reserves the right to request a sample of the product

that an applicant wishes to have reviewed and approved, it does not require that an applicant

provide a sample so that OMRI can conduct its own lab analysis.  OMRI Man. at 118-19.

Hence the requirement of full disclosure of all verifiable information.  Mot. Ex. 16, at 2-3.  If

OMRI determines that the ingredients of the product and its method of production comply

with organic farming requirements, OMRI lists the product as approved on its Brand Name

Materials List.  OMRI Man. at 118; Lewin Decl. ¶ 6.  In addition, the manufacturer is

1   permitted to affix an OMRI trademarked seal to the label stating that the product is "OMRI

2   Listed."  OMRI Man. at 136; Lewin Decl. ¶ 6; Mot. re Loss (dkt. 108) Ex. 16, at 2-3.  The

3   Operating Manual explicitly provides that a client "may not use OMRI's name, wording

4   options, or OMRI Listed seal to advertise or promote any product that has not yet completed

5   OMRI review or that has been removed from the OMRI list."  OMRI Man. at 136.

6       OMRI further requires that "[w]hen a supplier reformulates an OMRI Listed product

7   (adds or removes ingredients or processes), these changes must be reported to OMRI

8   immediately."  OMRI Man., at 137 (emphasis added).  "OMRI may consider this a new

9   product and may require submission of a complete application packet and per product review

10  fee."  Id.; Mot. re Loss Ex. 16, at 3.

11      Once OMRI approves a product as NOP-compliant, clients must renew their product

12  listings annually.  OMRI Man. at 135.  Among other things, this provides OMRI the

13  opportunity to review reformulated products.  Id.  In order to renew, clients are required to

14  pay a fee and provide current information on their products.  Id.  OMRI sends a renewal form

15  to each manufacturer with a list of all the products that manufacturer currently has listed as

16  OMRI approved.  The manufacturer is required to notify OMRI if there has been any change

17  in the information that the manufacturer has previously provided to OMRI about each

18  product.  If there has been no change in information, a representative of the manufacturer

19  signs a certification to that effect and returns it to OMRI.  Mot. re Loss Ex. 16 at 3-4.

20  Defendant signed several renewal forms in order to maintain Biolizer XN's OMRI approved

21  listing.  Govt's Exs. in Support of Mot. to Dismiss Counts 9 & 10 at 156-57, 167-68.

22      When it comes time for certifiers to do the annual inspection of an organic farm, they

23  often use OMRI's listing of products as a reference for determining whether a given product

24  being used by the farmer is allowed for use under the regulations.  Certifiers are required to

25  review the farmer's organic production plan, including the list of all substances and products

26  the farmer is applying to the soil.  If the product is a fertilizer with multiple ingredients –

27  such as Biolizer XN – the certifier can check to see if the product is "OMRI Listed."  If it is

28  and the product is not subject to other restrictions, then the certifier can consider the product

United States District Court

For the Northern District of California

to be compliant with the NOP regulations.  Lewin Decl. ¶¶ 7-8; McEvoy Decl. ¶¶ 6-8.  The USDA was aware that its certifiers were using and relying on OMRI review and approval of products and formally approved the practice in 2008.  Id.

## B. Defendant's Fraudulent Actions

Defendant founded CLF in 1998 and was President of the company from that time until he sold the assets, technology, and manufacturing facility to another entity in 2007.  CLF was in the business of selling organic fertilizer to organic farmers in California.  Plea Agreement ¶ 2(e).  In 1998 and 1999, Defendant submitted applications to OMRI in order to have CLF's fertilizer, Biolizer XN, reviewed for compliance with organic farming standards.  Id. ¶ 2(f).  In the applications, Defendant told OMRI that Biolizer XN was made with three ingredients: ocean going fish and fish by-products, feathermeal, and water.  Id.  In reliance on Townsley's representations, OMRI approved Biolizer XN for use in organic production.  Id.  CLF then began selling Biolizer XN as an organic fertilizer that was OMRI-approved and represented to CLF's customers, which included organic farms and distributors of organic fertilizer, that the ingredients were as described above.  Id.

No later than April 2000, Defendant knowingly changed the ingredients in Biolizer XN from fish and feathermeal to a product that contained ammonium chloride, an ingredient prohibited for use in organic farming.  Plea Agreement ¶ 2(g).  Even though, as discussed above, OMRI required manufacturers to provide immediate notification of any addition or removal of ingredients, Defendant did not notify OMRI of this change to Biolizer XN's composition.  Id.

On August 18, 2000, Defendant signed and submitted the annual renewal form to renew Biolizer XN's OMRI listing and falsely stated that the information previously submitted to OMRI about XN had not changed.  Id.  Similarly, Defendant did not notify his organic farmer customers of the change in ingredients.  He continued to market and sell Biolizer XN to his customers as OMRI-approved – when the new formulation was not so approved – and as containing fish and feathermeal knowing that these representations were not true.  Id.

**United States District Court**
For the Northern District of California

1      In June 2001, Defendant again changed the ingredients in Biolizer XN, this time

2   substituting a product that contained ammonium sulfate, another chemical ingredient that was

3   prohibited from use by growers in organic farming.  Plea Agreement ¶ 2(h).  Again,

4   Defendant did not notify OMRI of this change in formulation and continued to submit annual

5   forms to OMRI to renew Biolizer XN's approved listing in which he certified that nothing

6   had changed from the original information submitted about XN.  Id.  After making the

7   change to ammonium sulfate, Defendant continued to market and sell Biolizer XN to growers

8   and distributors as an OMRI approved product that contained fish and feathermeal when he

9   knew that neither of these representations was true.  Id.; See Mot. re Loss Exs. 4,5.

10      In pleading guilty, Defendant admitted that from June 2001 through December 2006,

11   when he represented Biolizer XN as being derived from fish and feathermeal and OMRI

12   approved for use in organic farming, he knew that these statements were false and that they

13   were material to the farmers who were purchasing his product.  Plea Agreement ¶ 2(i).  He

14   admitted that by so deceiving the growers and distributors who were CLF's customers he was

15   able to ensure continued sales of Biolizer XN to organic farmers.  Id.

16      As part of the investigation of this case, the government obtained copies of

17   Quickbooks accounting records for CLF covering data from July 2000 through 2008; records

18   from a company in Iowa called Ajinimoto, from which CLF purchased the product called

19   Proteferm containing ammonium chloride; and records from Archer Daniels Midland (ADM)

20   in Illinois, from which CLF purchased the product containing ammonium sulfate.  Both

21   Proteferm and the ADM product can be used as fertilizers in conventional, *i.e.* non-organic,

22   agriculture.  Numerous witnesses interviewed as part of this investigation reported that such

23   conventional fertilizers have a significantly higher amount of nitrogen – which is desirable –

24   than fertilizers that are made with non-synthetic NOP-compliant ingredients, are cheaper to

25   produce and purchase, and in liquid form flow more easily out of pipes designed for fertilizer

26   application.

27      CLF employees who worked for Defendant confirmed what was taking place at CLF

28   from 2000 through 2006.  For instance, Arturo Corona, one of the plant workers who was

responsible for putting ingredients (also known as inputs) into the machines (called digesters) for processing Biolizer XN, reported that from the time he started working at CLF in 2000 or 2001, neither fish nor feathermeal was used in XN production.  Instead, the input was a brown liquid that arrived by truck.  Mot. re Loss Ex. 6 at 1.  Jacob Evans, who worked as a salesperson for CLF from early 2000 until he resigned in 2003, stated that when he first started working for CLF, fish was the basis for CLF's products.  Mot. re Loss Ex. 7 at 1.  However, the organic fertilizer business in California was very competitive.  There were issues with the fertilizers flowing properly through drip irrigation lines and having a sufficiently high nitrogen level to satisfy farmers.  Id. at 1-2.

Evans recalled that sometime in 2000, CLF started using Proteferm, which contained ammonium chloride, as the sole input for Biolizer XN.  Id. at 2.  The XN labels continued to show fish and feathermeal even though that was not true.  Id.  Evans said that he expressed concern to Defendant about reporting the change to OMRI, and Defendant responded that changing the label could take five or six months and CLF could not stay competitive if they stopped selling XN.  Id.  Evans was also concerned about the fact that they were selling a product with an ingredient that was not permitted in organic farming, and reported that these concerns were regularly raised at meetings attended by Defendant.  Id. at 2-3.

According to Evans, Defendant hired a chemist to create new products that were "legit," and put pressure on this chemist to make an XN with a 6% nitrogen content from fish and feathermeal.  In the meantime, Defendant switched from using Proteferm in XN to the ADM product with ammonium sulfate.  Ex. 7, at 3.  Evans reported that the paperwork accompanying the shipments showed the words "ammonium sulfate."  Id.  At meetings, employees continued to express concern about the use of a prohibited substance and the false labels on Biolizer XN.  Id.  Upset about this development, Evans quit in 2003.  Id. at 5.

The parties have agreed that the gross revenue that CLF earned from the sale of XN between April 2000 and December 2006 was between $6.5 and $6.9 million.  According to the Quickbooks records, these figures represent sales to approximately 44 customers.

United States District Court
For the Northern District of California

As part of the investigation, agents interviewed a sample of growers and one distributor who purchased Biolizer XN from CLF during the period from April 2000 through December 2006, when CLF discontinued Biolizer XN production.  These interviews confirmed what Defendant admitted in pleading guilty, that is, that CLF's statements about XN containing fish and feathermeal and that the product was OMRI-approved were material to decisions to purchase Biolizer XN.  For instance, Otto Kramm at Mission Organics reported that he relied on the labeling on Biolizer XN in order to determine that it was certified organic, and that he would not have purchased XN if it was not approved by certifier CCOF and on the OMRI list.  Motion re Loss Ex. 9 at 5.

Ron Yokota, farm manager and part-owner of Tanimura and Antle, a large farming company in California and Arizona, confirmed what Otto Kramm had to say.  Records maintained by CLF and Tanimura show that Tanimura was CLF's single largest customer for XN, having spent more than $1.1 million on XN during the period that it contained prohibited substances.  Yokota stated that CLF, including salesman Jacob Evans, provided him with documentation, including a brochure, that clearly stated that Biolizer XN was a certified organic liquid fertilizer approved by OMRI.  Mot. re Loss Ex. 10 at 3.  To Yokota, the most important feature of the brochure was the OMRI logo.  Id.  He knew that certifier CCOF relied on the OMRI certification to determine whether products were acceptable for use on organic land.  Id.  Yokota would not have purchased Biolizer XN without assurances that it was acceptable for organic farming and accepted by CCOF.  Id.  He also would have been concerned about the financial risk of decertification.  Id.  Yokota went on to say that if his company's land had been decertified, his company would have lost the ability to sell its produce as organic for three years.  Id.

Organic fertilizer is expensive compared to conventional fertilizer.  Id. at 2.  For example, Biolizer XN with 6% nitrogen cost approximately $4 per pound of nitrogen, whereas conventional fertilizers, which have on average 28% nitrogen, cost approximately $0.50 per pound of nitrogen.  Id.  Yokota stated that land converted to organic agriculture

1   was expensive, yielded less produce, could only be maintained with less effective chemicals,

2   and was more vulnerable to diseases and insects.  Id. at 2.[1]

3           **C.**        **The Discovery that Biolizer XN Contained Prohibited Substances**

4         Enforcement of NOP regulations is shared by the NOP and the state of California

5   through the CDFA.  McEvoy Decl. Ex. 3 ¶ 9. The state of California, through the CDFA, has

6   a USDA-approved state organic program and, as such, takes on responsibility for the

7   NOP within the state.  Id.  Complaints about non-compliance with the NOP can be referred to

8   the CDFA and the CDFA has the authority to investigate those complaints.  Id.

9         In 2004, a now-deceased CLF employee mailed a complaint to the CDFA stating that

10  CLF was selling non-organic fertilizer misbranded as organic. This whistle-blower told the

11  CDFA that CLF was purchasing ammonium sulfate from ADM and selling it as organic

12  fertilizer under the name of Biolizer XN and another CLF product.  The CDFA initiated an

13  investigation which concluded in 2006.  Special Investigator Pierre Labossiere was assigned

14  to investigate the matter in 2005 and interviewed the whistle blower, who complained that

15  the wrongdoing was ongoing, CLF was selling ammonium sulfate to one of the largest

16  organic farms in California, and he was frustrated that nothing was being done to stop it.

17  Labossiere obtained records from ADM, tracked shipments of ADM product by truck and

18  railcar to CLF, interviewed CLF employees, and took samples from various sources,

19  including samples of ADM product from railcars and the CLF plant, and from Biolizer XN

20  sold to farmers.  The lab results of these samples were not sufficiently detailed to provide a

21  fingerprint-type identification, that is, they did not show that the chemical composition of the

22  ammonium product sold by ADM was identical to the product being sold by CLF as Biolizer

23  XN.  The lab results did, however, show that the chemical composition of XN was consistent

24  with that of the ADM product.  This helped explain what CLF was doing with the 14-plus

25  tons of

---

27       [1] Yokota reported that he eventually learned that neither the California Department of Food and

28  Agriculture and CCOF was going to decertify farms after discovering they had applied the prohibited substances in Biolizer XN to the soil.  Id. at 5.  It was his understanding that CLF had supplied too much of the organic farming industry and massive decertification would have been disastrous. Mot. re Loss Ex. 10 at 2.

1   the liquid ammonium sulfate product that it purchased from ADM from June 2001 through
2   the end of 2006.

3       Laboissiere's final report was completed in October 2006 and referred to CDFA's legal
4   division two months later.  Documents obtained as a result of this investigation show that at
5   the end of December 2006, as a result of a CDFA enforcement action, Defendant entered into
6   a written agreement in which he agreed to notify OMRI immediately which Biolizer material
7   was not organic due to having an impermissible ammonia sulfate component.  Among other
8   things, Defendant also agreed not to ship any Biolizer product containing ammonia sulfate in
9   the future labeled in a way that claimed or suggested that the product was organic.

10       On December 28, 2006, Defendant wrote to OMRI to advise that CLF had "recently
11   been made aware that one of the inputs used in the formulation of our Biolizer XN product
12   has changed, and no longer meets the original specifications as submitted to your
13   organization."  Mot. re Loss Ex. 13.  Defendant went on to advise that CLF had discontinued
14   production of its Biolizer XN material and requested that the product be removed from
15   OMRI's list effective immediately.  Id.  By way of letter dated January 10, 2007, OMRI
16   acknowledged receipt of Defendant's request and stated that it was removing Biolizer XN
17   from the OMRI Products List.  Mot. re Loss Ex. 14.

18       The issue whether or not farmers who used Biolizer XN would be decertified was the
19   subject of considerable debate within the organic community and led to hearings before the
20   California State Senate.  At the end of the day, a decision was made not to decertify the
21   farmers who used Biolizer XN.  Decertification would have meant that farmers who used XN
22   could not market produce grown on that land for the next three years as "organic."  If the
23   farmer wished to become re-certified, he or she would have to incur the expense of growing
24   crops in full compliance with the NOP regulations for three years, during which time the
25   farmer could only market the produce as conventional, less expensive, "non-organic"
26   produce.

27

28

**United States District Court**
For the Northern District of California

**D.      Cost of the Conventional Fertilizer on the Open Market**

Clancy Arendt from Ajinomoto states that Proteferm was available for sale directly to farmers in the relevant 2000 to 2001 time frame as a conventional fertilizer in liquid form with 6 to 6.5% nitrogen.  <u>See</u> Arendt Decl. (dkt. 119) ¶¶ 4-5.  Proteferm is produced by Ajinomoto as a by-product of the manufacture of monosodium glutamate.  <u>Id.</u> ¶ 3.  Ajinomoto would have charged farmers buying Proteferm anywhere from $10/ton to $50/ton for the product.  There are approximately 200 gallons of Proteferm in a ton.  <u>Id.</u> ¶¶ 7, 9.  Defendant initially paid Ajinomoto $30/ton, but subsequently negotiated the price down to $10/ton.  <u>Id.</u> ¶ 7.  A farmer buying the product directly would have had to pay the cost of transportation.  <u>Id.</u> ¶ 10.  Purchasers would have to arrange for transportation by truck or railcar which would load the product at Ajinomoto's Eddyville, Iowa plant.  <u>Id.</u> ¶ 10.  Mr. Arendt's best recollection is that total transportation cost to California by railcar would have been approximately $40/ton.  <u>Id.</u>  Total cost of transportation to California by truck would have been approximately $180 – $220/ton.  <u>Id.</u>

Erik Heggen from ADM states that the product ADM sold as a conventional fertilizer, in liquid form, with 5% to 6% nitrogen, was the by-product of ADM's manufacture of lysine.  <u>See</u> Heggen Decl. (dkt. 120).  ADM referred to the product as ammonium sulfate.  <u>Id.</u>  In the 2001 to 2006 time frame, ADM sold the ammonium sulfate by the truckload of approximately 48,000 pounds, or in railcars holding approximately 200,000 pounds of the product.  <u>Id.</u>  The fertilizer was priced by the ton, and to Mr. Heggen's best recollection, the product was sold at the time for approximately $19/ton.  <u>Id.</u>  Purchasers were responsible for the transportation costs of the ammonium sulfate from ADM's plant in Decatur, Illinois.  <u>Id.</u>  Mr. Heggen states that during the 2001 to 2006 time frame, ADM sold the ammonium sulfate fertilizer to CLF in California and to farmers in Illinois and Indiana.  <u>Id.</u>  If a farmer in California contacted ADM seeking to purchase the ammonium sulfate fertilizer, and was prepared to purchase at least a truckload and be responsible for transportation costs, ADM would have sold the product directly to that farmer.  <u>Id.</u>  The cost would have been no

1  different than that charged to CLF. Id. Mr. Heggen states that to the best of his knowledge,

2  there are approximately 210 gallons in a ton of the ammonium sulfate product. Id.

3      Defendant argues the farmers would not have been able to ship the products by rail,

4  since doing so required purchasing 200,000 pounds (200 tons) of product. Response to Supp.

5  Mot. (dkt. 121) at 9. Rather, Defendant argues it would only have been reasonably for

6  individual farmers to ship by truck in order to directly receive the conventional fertilizer

7  product.

## II.    LEGAL STANDARD

9      The sentence of a defendant convicted of federal fraud offenses should reflect the

10  nature and magnitude of the loss caused or intended by his or her their crimes. See U.S.S.G.

11  § 2B1.1, Background Comment (2011 ed.). "[A]long with other relevant factors under the

12  guidelines, loss serves as a measure of the seriousness of the offense and the defendant's

13  relative culpability and is a principal factor in determining the offense level" under §2 B1.1.

14  Id. Under §2B1.1, "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1,

15  App.N. 3(A). Actual loss "means the reasonably foreseeable pecuniary harm that resulted

16  from the offense," and intended loss is "the pecuniary harm that was intended to result from

17  the offense." Id. at (i) & (ii). Pecuniary harm is "harm that is monetary or otherwise readily

18  measured in money," and "reasonably foreseeable pecuniary harm" means "pecuniary harm

19  that the defendant knew or, under the circumstances, reasonably should have known, was the

20  potential result of the offense." Id. at (iii) & (iv). In cases in which there is a loss but it

21  reasonably cannot be determined, "the court shall use the gain that resulted from the offense

22  as an alternative measure of loss . . . ." U.S.S.G. § 2B1.1, App. N. 3(B).

23      The Ninth Circuit instructs district courts "to take a realistic, economic approach to

24  determine what losses the defendant truly caused or intended to cause." E.g., United States

25  v. W. Coast Aluminum Heat Treating Co., 265 F.3d 986, 991 (9th Cir. 2001). The district

26  court is not obligated to find "the perfect theoretical or statistical fit." Id.

27

28

**United States District Court**
For the Northern District of California

III.   **DISCUSSION**

The parties have diametrically opposite views of the proper loss calculation in this case.  The Government argues the full amount of revenue Defendant received – $6.5 to $6.9 million dollars – is the proper amount of the loss because if the consumers had known the real ingredients of the fertilizer, they never would have purchased it.  Therefore, it had no value, and caused a loss of the full purchase price.  Defendant argues, in contrast, that while Biolizer XN did not contain fish or feathermeal, by going through the HTLC process it was still an "organic" fertilizer that would pass NOP standards.  Thus, he argues his customers received what they bargained for, and the loss is consequently zero.  The Court disagrees with both of these extreme positions.

**A.     Defendant's Knowledge and the Composition of Biolizer XN**

As an initial matter, Defendant spends much of his briefing running away from his plea and the facts and evidence as presented in this case.  In the initial briefing regarding the loss calculation, Defendant argues that (1) he did not know the new inputs contained prohibited synthetic materials, and (2) that the HTLC process somehow rendered the synthetic inputs "organic."  See, e.g., Mot. at 5, 8-9.  In his supplemental briefing, Defendant presents an alleged expert declaration offering the opinion that the synthetic, purchased fertilizer was actually an "organic" fertilizer that would comply with NOP regulations.  These contentions are not supported by the evidence.

First, the evidence demonstrates directly and circumstantially that Defendant knew the inputs were synthetic chemicals.  As a background matter, it is undisputed that Defendant changed the ingredients (also known as inputs) in Biolizer XN so that there was no fish or feathermeal at all, but continued to lie to customers by representing on the labels and product literature that XN was derived solely from "ocean going fish and hydrolized feathermeal" or "seafood byproducts, plant extracts, and hydrolized feathermeal."  His explanation that a delay from changing the labels and renewing OMRI certification would have taken too long (4-5 months) is simply implausible given the time frame of the fraud (5-6 years) and the other evidence.  More important, there is specific evidence of knowledge.  Employee Jake

1    Evans stated that when he learned Proteferm contained ammonium chloride, which is not

2    organic compliant, he discussed it with Defendant, who put him off.  Mot. re Loss Ex. 7 at 2.

3    Employee Macura stated that the topic of ammonium sulfate being used as an input for

4    Biolizer XN was discussed at staff meetings where Defendant was present.  Reply Mot. (dkt.

5    111) Ex. E at PT18138.  Employee Lorente stated that the labels for the ADM product stated

6    it contained ammonium sulfate, and that he provided these documents to Defendant.  Reply

7    Mot. Ex. F. at PT07000, PT06904, PT18142-43.  Thus, it is implausible to suggest Defendant

8    did not know the inputs were synthetic chemicals.

9        Second, the evidence demonstrates that the fertilizer did not even necessarily go

10   through the HTLC process, but rather was sometimes simply delivered straight to customers

11   at busy times, or only run through a filter, rather than spending three days in the digester.

12   Mot. re Loss Ex. 7 at 5 (Evans's testimony); Reply Ex. F, PT18144, Ex. G at PT 13054

13   (Lorente testimony).  Thus, the Court cannot determine that the process would render a

14   product "organic" when the evidence demonstrates the process was not even used

15   consistently.

16       Third, there is no reliable evidence that the HTLC process renders synthetic material

17   organic, nor did Defendant ever claim so at the time the process was in use.  In his

18   submissions to OMRI, Defendant described the HTLC process as one that deals solely with

19   organic inputs.  Reply Ex. C. at PT12748, Ex D. PT12012, PT 12014-15.

20       Fourth, the Government presents convincing evidence that Biolizer XN was not, and

21   could not be under the Guidelines in place at the time and now, considered an "organic"

22   fertilizer that would comply with NOP regulations.  Defendant presents a declaration

23   claiming the HTLC process renders the synthetic inputs into an organic fertilizer that would

24   comply with NOP guidelines.

25       As the sole support for the assertion that the fertilizer he sold to his organic farmer

26   customers was "organic under the National Organic Program ("NOP") regulations,"

27   Defendant provided the Declaration of Neal Connors, Ph.D.  See Connors Decl. (dkt. 121-1).

28   It appears that Dr. Connors has expertise in the fields of fermentation, microbiology, and

**United States District Court**
For the Northern District of California

biotechnology.  However, Dr. Connors' resume reveals no experience with or expertise in the field of organic agriculture, how that industry is regulated, and in particular, the U.S. Department of Agriculture, National Organic Program regulations, including their meaning, implementation, and enforcement.  Nonetheless, Dr. Connors renders an opinion that the fertilizer Townsley sold under the name Biolizer XN was not synthetic, as that word is defined in the NOP regulations.  Connors Decl. ¶ 8.  From that, Dr. Connors opines that growers who used Biolizer XN would not have been in violation of the NOP regulations, and agricultural products grown with Biolizer XN could be sold as "organic," as that word is defined in the NOP regulations.  Id. ¶¶ 12-13.

Dr. Connors bases his lynchpin opinion that Biolizer XN was not synthetic on (1) his reading of the NOP definition of the word "synthetic;" (2) his assumption that all the conventional fertilizer that Defendant purchased from ADM and Ajinomoto was put through the HTLC process; (3) a flow diagram of the HTLC process; and (4) what Dr. Connors has apparently been told about how the HTLC process worked. Connors Decl. at 1-3.

In order to obtain the NOP's assessment of the accuracy of Dr. Connors' reading of the NOP regulations and conclusions, the government provided Dr. Connors' Declaration, the materials upon which Dr. Connors relied, and two written descriptions of the HTLC process which appear to be either authored or approved by Townsley, to Miles McEvoy of the NOP to review.  Mr. McEvoy is the current head of the NOP, and has held that position since 2009.  He is responsible for administering the NOP, which includes, but is not limited to, developing and issuing NOP regulations and policies, accrediting and conducting audits of certifying agents, and managing compliance and enforcement programs.  McEvoy Decl. (dkt. 124-1) ¶ 1.  The Court finds him to be a reliable expert on this issue.

Mr. McEvoy has also worked in the field of organic agriculture and organic certification for over twenty years.  Id. ¶ 2.  Mr. McEvoy, speaking on behalf of the NOP, advises that during the time that Defendant used the conventional fertilizers he purchased from Ajinomoto and ADM as ingredients in the fertilizer he sold as Biolizer XN, Biolizer XN was a synthetic substance and would have been prohibited for use in organic production.

United States District Court
For the Northern District of California

McEvoy Decl. ¶¶ 5-12.  Mr. McEvoy explains that certain ingredients in the Ajinomoto fertilizer (ammonium chloride) and the ADM fertilizer (ammonium sulfate) that went into Biolizer XN were (and remain) synthetic substances prohibited for use in organic agriculture under the NOP regulations.  Id. ¶¶ 7, 11-13.  Neither the Organic Foods Production Act nor the NOP regulations provides for a process that renders prohibited synthetic substances "non-synthetic."  Id. ¶ 14.  This includes putting those substances through a process that could be characterized as a "naturally occurring biological process."  Id.  As Mr. McEvoy puts it "[t]he addition of synthetic chemical inputs, including synthetic ammonium sulfate and ammonium chloride, during the manufacture of Biolizer XN irrevocably rendered the final product 'synthetic' as defined by the NOP regulations."  Id. ¶ 15.

Even a layperson's reading of the NOP definition of "synthetic" upon which Dr. Connors relies shows the flaw in Dr. Connors's reasoning.  Dr. Connors points to a phrase in the definition which states that "substances created by naturally occurring biological processes" are not considered "synthetic."  See 7 C.F.R. § 205.  The key word in that phrase is the word "created."  For those times when Defendant took the ADM and Ajinomoto fertilizers and put them through his composting process to thin them out, he was simply putting an already-created synthetic substance through an additional step which could be characterized as a naturally occurring biological process.  He was not creating a product.  And as Mr. McEvoy further explains, the fact that synthetic substances were going into the process rendered the final product irrevocably synthetic under the NOP regulations.

In addition, Dr. Connors does not discuss, much less explain, the fact that the flow chart of the HTLC process upon which he relies shows that the original inputs into the process are described as "Incoming Mixed Organic Feedstock."  See Connors Decl. Ex. D (emphasis added).  This is consistent with Defendant's own written descriptions of the process, which always state that it is a process designed to treat organic waste material.  For instance, one such description states: "The HTLC process is an extremely efficient, state-of-the-art, in-vessel biological system which rapidly converts organic waste materials (including fish byproducts, vegetable and plant wastes, meat wastes, supermarket wastes, etc.) into high

quality liquid organic fertilizer products."  Reply Ex. D, at PT12033.  Defendant's own descriptions never claim that HTLC is a process that transforms or renders non-organic, *i.e.* synthetic, substances into those which are organic.

Finally, employees who worked for Defendant said that during the growing season from spring to fall, when Biolizer XN was in high demand, it was not uncommon to simply deliver the Ajinomoto and ADM conventional fertilizers to customers without any further treatment at all.

For all these reasons, the Court finds to the extent necessary to calculate the loss figure, that the product that Defendant sold to his customers under the name Biolizer XN was a synthetic substance prohibited for use in organic agriculture under the NOP regulations, and farmers who used the product would not have been in compliance with those regulations. Thus, to the extent Defendant's arguments rest on the claim that he was either ignorant of what was going on, or that his customers received something of equal value to that which they thought they were buying, the Court rejects these arguments.

### B.    Pecuniary Loss to Customers

Under § 2B1.1, "loss is the greater of actual loss or intended loss."  U.S.S.G. § 2B1.1, App.N. 3(A).  Actual loss "means the reasonably foreseeable pecuniary harm that resulted from the offense," and intended loss is "the pecuniary harm that was intended to result from the offense."  Id. at (i) & (ii).  Pecuniary harm is "harm that is monetary or otherwise readily measured in money," and "reasonably foreseeable pecuniary harm" means "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was the potential result of the offense."  Id. at (iii) & (iv).

Several courts have held that when a fraud scheme induces customers to pay a higher value for something that purports to meet certain specifications, but does not actually meet those specifications, the cost of the product itself, *i.e.*, the Defendant's gross monetary gain, is a proper measure of pecuniary harm.  For example, in United States v. Munoz, 430 F.3d 1357, 1361, 1370-73 (11th Cir. 2005), the defendant sold drugs to treat erectile dysfunction through telemarketing and without a prescription, but the product sold "barely resembled"

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   product that was marketed, and was only as effective as a placebo.  The Court of Appeals

2   upheld district court's use of the gross sales figure as the measure of loss, and then deducted

3   30% for the estimated 30% who likely found the drug effective due to the placebo effect.  Id.

4   Thus, the Court of Appeals approved a system of using the total gain from the sale of the

5   fraudulent product, as limited by the potential value of what the customers did receive.

6          The Second Circuit applied the same reasoning in United States v. Canova, 412 F.3d

7   331 (2nd Cir. 2005).  In that case, the defendant managed a company that tested pacemakers

8   for Medicare patients and was reimbursed by the federal government as long as it complied

9   with certain testing procedures and specifications.  Id. at 335-36.  In order to process a

10  greater number of tests, the defendant's employees cut corners and did not fully comply with

11  the Medicare testing requirements.  Id. at 336-37.  The jury convicted the defendant on a

12  number of charges, including conspiracy to defraud Medicare by making false statements.

13  Id. at 335.  The Court of Appeals found that the $5 million that Medicare paid to the

14  defendant's company for the tests that failed to follow specifications supported an intended

15  loss of $5 million.  Id. at 355-56.  The court found that "[w]hen a party fraudulently procures

16  payment for goods or services by representing that they were produced or provided according

17  to certain specifications, it is not the task of a sentencing court to second-guess the victim's

18  judgment as to the necessity of those specifications."  Id. at 352.  "Whether the testing time

19  on a pacemaker, the number of rivets on an airplane wing, or the coats of paint on

20  refurbished building is a matter of necessity or whim, the fact remains that the victim has

21  been induced to pay for something that it wanted and was promised but did not get, thereby

22  incurring some measure of pecuniary harm."  Id.  Further, "[a] party who contracts to have

23  goods produced or services performed according to certain specifications, and who pays for

24  those goods or services in reliance on a fraudulent representation that they conform to the

25  specifications, has sustained a measure of pecuniary loss for purposes of calculating the fraud

26  guideline . . . ."  Id. at 354.  Citing the Guidelines provision that allows the use of defendant's

27  gain as an alternative figure for loss estimate, the court concluded that the monies paid for

28

United States District Court
For the Northern District of California

the tests that did not conform to specifications provided a "satisfactory alternative for calculating intended loss under the Guidelines." Id.

This methodology for calculating loss when customers bargain for one thing and receive another has also been approved by the Ninth Circuit. In United States v. Cambra, 933 F.2d 752 (9th Cir. 1991), the defendant sold counterfeit steroids, representing the drugs to be products made by reputable manufacturers. Id. at 755. The defendant pled guilty to several charges, including ones that involved fraud and deceit on federal enforcement agencies, consumers, or both and the parties stipulated that the dollar value of the drugs sold was $500,000. Id. at 755-56. The Ninth Circuit upheld the district court's decision to adjust the base offense level under then-applicable U.S.S.G. § 2F1.1 by the "amount of the fraud," that is, the $500,000. Id. at 756-57. Thus, the Ninth Circuit has found an appropriate measure of pecuniary harm in this type of situation to be the value to the defendant of the fraudulent product sold.

The Court finds a similar reasoning applies here. As discussed in detail above in the description of the scheme, Defendant's customers believed they were receiving a fertilizer composed of "ocean going fish and hydrolized feathermeal" or "seafood byproducts, plant extracts, and hydrolized feathermeal," that was OMRI-certified, as appropriate for use in organic farming. In fact, neither of those material representations was true. Moreover, the customers would not have purchased the fertilizer if they had known that the representations were untrue, and that the fertilizer in fact was conventional, synthetic fertilizer. In fact, using such fertilizer on their crops put the customers at risk of decertification of their status as organic farms, and thus, put them at great potential financial risk. Thus, purchasing the fertilizer caused the customers a clear pecuniary harm.

"A party who contracts to have goods produced or services performed according to certain specifications, and who pays for those goods or services in reliance on a fraudulent representation that they conform to the specifications, has sustained a measure of pecuniary loss for purposes of calculating the fraud guideline . . . ." Canova. 412 F.3d at 354. Like in Munoz, 430 F.3d at 1361, 1370-73, the Court finds the gross sales figure of Biolizer XN to

United States District Court
For the Northern District of California

1    be an appropriate measure of the measure of loss in this case.  See also, Canova, 412 F.3d at

2    354; Cambra, 933 F.2d at 756-57.  Thus, the Court finds that the proper measure of pecuniary

3    harm in this case is $6.5 million dollars.[2]

4          **C.**      **Credit for Value of the Conventional Fertilizer Received**

5          Application Note 3(E) to U.S.S.G. § 2B1.1 provides that loss calculation in a fraud

6    case shall be reduced in two instances: (1) by the value of any collateral pledged, or (2) by

7    the amount of "[t]he money returned, and the fair market value of the property returned and

8    the services rendered, by the defendant or other persons acting jointly with the defendant, to

9    the victim before the offense was detected." § 2B1.1, App.N. 3(E).  The Government argues

10   there should be no credit given, as the Biolizer XN fertilizer Defendant sold had no worth to

11   consumers given the fraud.  Defendant argues in contrast that a full credit should be given

12   because the fertilizer was still "organic" under the guidelines, and thus, the customers

13   received something of full value for the price they paid.

14         The Court finds a middle course appropriate here.  The Court acknowledges the

15   evidence from growers that they likely would not have bought Defendant's fertilizer at all if

16   they had known it was simply a conventional, synthetic fertilizer.  Additionally, this put the

17   customers as a great financial risk if discovery of the fraud had lead to a decertification of

18   their status as organic farms.  Still, under the very specific factual circumstances of this case,

19   the Court finds it appropriate to provide a credit for the fair market value of the conventional

20   fertilizer the customers received in this instance, as the customers used the fertilizer, it

21   fertilized their crops, the crops sold for profit, and a mass decertification did not occur.

22         The Court finds that the special rule in Application Note (F)(v) to § 2B1.1, which

23   prohibits credit for the value of goods provided under certain circumstances, does not apply

24   to these particular facts. That Note provides that "[i]n a case involving a scheme in which . . .

25   (II) goods were falsely represented as approved by a governmental regulatory agency; or (III)

26   goods for which regulatory approval by a government agency was required by not obtained,

27

28       [2] The parties agree the gross sales figure number ranges from $6.5 to $6.9 million.  Given this uncertainty, the Court will use the lower figure to calculate the loss.

1  or was obtained by fraud, loss shall include the amount paid for the property, services, or

2  goods transferred, rendered, or misrepresented, with no credit provided for the value of those

3  items or services."  § 2B1.1, App.N. 3(F)(v).

4      For instance, in United States v. Goldberg, 538 F.3d 280 (3d Cir. 2008), the defendant

5  sold veterinary grade prescription drugs without a prescription and was convicted of mail

6  fraud, wire fraud, and selling misbranded drugs.  Id. at 282-84.  On appeal, the defendant

7  complained that the district court erred "when it used his company's $1.1 million in total

8  gross profits as a proxy for the losses suffered, and thus erred in relying on those profits to

9  calibrate the § 2B1.1(b)(1) [loss] enhancement."  Id. at 290.  In particular, the defendant

10 argued that the record produced "scant, if any, evidence of actual harm . . . ."  Id.

11 Referencing Note 3(F)(v) and the fact that under FDA regulations, prescriptions were

12 required for these drugs, the Court upheld the district court's reasoning, finding that the

13 pecuniary harm was the amount customers paid for the drugs.  Id. at 290-91.

14     As discussed in detail in this Court's previous order in this case, OMRI is not actually

15 a governmental regulatory agency.  While this Court appreciates the seriousness of

16 Defendant's conduct, and its interconnection with government regulations, it does not find

17 that the exception in Note 3(F)(v) is appropriate in these specific factual circumstances.

18     The Government submitted evidence of the price a customer would have had to pay

19 on the open market to purchase the two conventional fertilizers at issue in this case, and

20 Defendant does not challenge these base prices – $30/ton of the Ajinomoto product and

21 $19/ton of the ADM product.  Supp. Memo (dkt 118) at 6-7.  The parties disagree over the

22 proper measure to be included in the price for transportation costs.  The Government argues

23 that the proper measure for transportation costs is the $40/ton cost of transportation by

24 railcar, based on the assumption that customers would have used the cheapest method of

25 transport available.  Id. at 6.  Defendant argues instead that the proper measure is the

26 $216/ton cost of transportation by truck, because customers would not have been able to

27 purchase fertilizer in sufficiently large quantities to ship by railcar, which required buying

28 200,000 pounds (200 tons) at one time.  Response to Supp. Memo (dkt. 121) at 9.  The Court

agrees with Defendant, that given the amount of fertilizer purchased by individual customers, it is unlikely they would be able to use a railcar for transportation purposes.  Thus, the proper measure of transportation costs is that for transport by truck – $216/ton.

Defendant also argues that he should receive a credit in the value of the conventional fertilizer for the price of operating the HTLC digesters, as he argues the digesters caused Biolizer XN to be substantially different from the input materials, the conventional fertilizers. Response to Supp. Memo (dkt. 121) at 4.  As discussed in detail above, the Court does not find this argument to be convincing, and declines to add the $108/ton cost Defendant argues he spent to manufacture Biolizer XN into the calculation of the value of the conventional fertilizer his customers received.

To calculate the costs for the conventional fertilizer on the open market, the Court added the cost of the inputs to the cost of transportation, and then multiplied it by the number of tons of each input purchased over the relevant time period.  This calculation is summarized in the table below.

|  | Ajinomoto Input | ADM Input |
| --- | --- | --- |
| Product Cost | $30/ton | $19/ton |
| Transportation Cost (truck) | $216/ton | $216/ton |
| Subtotal | $246/ton | $235/ton |
| Tons Purchased | 3,780 | 12,985 |
| Total COST | $929,880 | $3,051,475 |

Thus, the Court determines that the price Defendant's customers would have had to pay on the open market for the conventional fertilizer they did receive from Defendant is $3,981,355.00.  The Court credits this amount against the total $6.5 million loss number, for a loss figure of $2,518,645.00 million.

//

//

//

//

IV.    **CONCLUSION**

For the forgoing reasons, the Court determines that the proper loss calculation in this unique fraud case is $2,518,645.00 million.

**IT IS SO ORDERED.**

Dated: August 1, 2012

_____
CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California