MELINDA HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

STACEY P. GEIS (CABN 181444)
SUSAN E. BADGER (CABN 124365)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102
    Telephone: (415) 436-7126
    Facsimile: (415) 436-6753
    E-Mail: stacey.geis@usdoj.gov

Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No: CR 10-00428 CRB |
| v. | THE UNITED STATES' SENTENCING MEMORANDUM |
| PETER TOWNSLEY, | |
| Defendant. | Hearing:    November 7, 2012<br>Time:    2:15 pm<br>Court:    The Honorable Charles R. Breyer |

# TABLE OF CONTENTS

I.      INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     DISCUSSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   A.  Offense Conduct  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   B.  Guidelines Calculation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   C.  Government's Sentencing Recommendation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      1.    Nature of the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      2.    Seriousness of the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

         a.     Growers Suffered Both Pecuniary and Non-Pecuniary Consequences . . . 5

         b.     The Fraud was Passed Through to Consumers  . . . . . . . . . . . . . . . . . . . . . 7

         c.     Townsley's Fraud Impacted the Regulatory Scheme  . . . . . . . . . . . . . . . . 9

      3.    Deterrence and Consistency in Sentencing  . . . . . . . . . . . . . . . . . . . . . . . . . . 10

         a.     Deterrence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

         b.     Consistent Sentencing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      4.    Protecting the Public From Similar Crimes of Defendant . . . . . . . . . . . . . . . . 13

      5.    Reasons for a Section 3553 Variance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

III.    CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

1

## TABLE OF AUTHORITIES

2

### FEDERAL CASES

3

*United States v. Harold Chase*, Case No. 6:11-CR-60133-AA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

4

*United States v. Kenneth Nelson, Jr.,* Case No. 1:11-CR-0096 AWI  . . . . . . . . . . . . . . . . . . . .  13

5

6

### FEDERAL STATUTES/RULES/GUIDELINES

7

18 U.S.C. § 1341  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

8

18 U.S.C. § 3553(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2, 12

9

Fed. R. Crim. P. 11(c)(1)(A) & (B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

10

U.S.S.G. § 2B1.1(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 7

11

U.S.S.G. § 2B1.1(b)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

12

U.S.S.G. § 2B1.1(b)(2)(A)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

13

U.S.S.G. § 3B1.1.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

14

U.S.S.G. § 3E1.1(a) & (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.    **INTRODUCTION**

Defendant Peter Townsley comes before the Court to be sentenced following his conviction for two counts of mail fraud, in violation of 18 U.S.C. § 1341. Townsley was convicted based on his guilty plea pursuant to a plea agreement under Fed. R. Crim. P. 11(c)(1)(A) & (B). The United States files this pleading to address the offense conduct, and Guideline calculations, as well as to advise the Court of its sentencing recommendation of 46 months imprisonment, three years of supervised release, and a fine of $125,000.

II.   **DISCUSSION**

A.    **Offense Conduct**

The facts of this case are well chronicled in both the presentence report ("PSR") as well as the Court's recent Order Re Loss Calculation, Doc. 127, issued August 1, 2012. In brief, Townsley engaged in a scheme to defraud his customers, from approximately April 2000 through December 2006, by (1) falsely representing that the ingredients in CLF's fertilizer, Biolizer XN, were fish, feathermeal, and water when he knew that was not true and that instead Biolizer XN contained chemicals prohibited for use in organic farming, and (2) falsely representing that the formulation of Biolizer XN had been approved by the Organic Materials Review Institute for use in organic farming. *See* Plea Agreement, Doc.100, filed February 22, 2012, Exhibit 1 , at ¶ 2(e)-(j). Townsley admitted that CLF's gross revenue from the sale of Biolizer XN during that time period was between $6.5 million and $6.9 million. *Id*. at ¶ 2(k).

B.    **Guidelines Calculation**

The United States agrees with the PSR's final calculation of the Sentencing Guidelines. The government agrees that the base offense level is 7. *See* U.S.S.G. § 2B1.1(a)(1)(B). There is a 18-level increase because the loss amount was $2,518,645. *See* U.S.S.G. § 2B1.1(b)(1).[1] There is a 2-level enhancement for the number of victims being greater than 10, but less than 50.

---

[1]    After extensive briefing by the parties, the Court determined the loss calculation to be $2,518,645 based on the difference between what growers paid Townsley for Biolizer XN, and what they would have paid if they had purchased the conventional fertilizer that Townsley sold to them under the guise of organic fertilizer. *See* Order Re Loss Calculation at p. 25.

1   *See* U.S.S.G. § 2B1.1(b)(2)(A)(I).  There is also a 2-level enhancement for role in the offense.

2   *See* U.S.S.G. § 3B1.1.  The government further agrees that there is a 3-level reduction for

3   acceptance of responsibility. *See* U.S.S.G. § 3E1.1(a) & (b).  Thus, the adjusted offense level is

4   26.  Because Townsley has a Criminal History Category of I, the applicable Guideline range is

5   63 to 78 months in Zone D.

6   **C.    Government's Sentencing Recommendation**

7       For the reasons set forth below, the government is recommending that the Court grant a

8   variance under 18 U.S.C. § 3553(a) and sentence Townsley to 46 months imprisonment.  In

9   doing so, the government disagrees with the one year and one day sentence of imprisonment that

10  Probation is recommending.  Such a sentence, which is an 80% reduction from the low-end of

11  the applicable Guideline range, would not fulfill the requirements of sentencing under § 3553(a).

12  While the government agrees, as discussed below, that some variance from the Guideline range

13  is appropriate under the specific circumstances of this case, it is equally clear that the § 3553(a)

14  factors require a substantial term of imprisonment.  A 46-month sentence appropriately takes

15  into account the nature and circumstances of the offense and history and characteristics of the

16  defendant, reflects the seriousness of the offense, promotes respect for the law, provides just

17  punishment for the offense committed, affords adequate deterrence to criminal conduct (both

18  generally and specifically), provides consistency and uniformity in sentencing, and protects the

19  public from further crimes of the defendant. *Id.*  Specifically, a 46-month prison sentence reflects

20  the seriousness of Townsley's fraud in undermining the integrity of a federal regulatory program

21  such as the USDA's National Organic Program ("NOP") and the impact that the fraud had not

22  only on the growers who purchased Biolizer XN and passed the fraudulent product onto

23  consumers, but on the entire organic industry.  The government's analysis of the applicable

24  Section 3553 factors is as follows.

25       **1.    *Nature of the Offense***

26       Both the government and the Court have briefed the particulars of the nature and

27  circumstances of Townsley's fraudulent scheme. *See* Govt's Legal Memorandum Re

28  Methodology for Calculating Loss, Doc. 108 and Court's Order Re Loss Calculation, Doc. 127.

For purposes of sentencing, however, the government wishes to highlight several facts related to the nature of the offense. Not only did Townsley perpetuate this fraud for over six years, but he continued to perpetuate the fraud while he knew that the California Department of Food and Agriculture ("CDFA") was investigating him starting in 2004. Townsley only stopped defrauding his customers when he was caught in December 2006 and CDFA issued a cease and desist order regarding the sale of Biolizer XN. These facts make the nature of the offense even more troubling. It is possible that Townsley may not have not set out to commit fraud in 1997 when he first developed Biolizer XN (similar to the way that those who conduct a Ponzi scheme often do not start out intending to defraud their investors). However, any such initial good intentions do not minimize the seriousness of the ultimate crime. Townsley embarked on defrauding his customers in April 2000, when he first knowingly substituted a product containing the prohibited chemical ammonium chloride in his Biolizer XN fertilizer. Over the next six and a half years, Townsley made choices that ensured the fraud continued and his company received millions in revenues. He did so even after CDFA began investigating his company. He annually sent false certifications to the Organic Materials Review Institute ("OMRI") stating that nothing had changed in the formulation of Biolizer XN. He deflected the concerns of employees who openly objected to continually perpetrating a fraud on CLF's organic farmer customers, with one employee finally becoming so concerned that he contacted CDFA and notified them of the fraud. At any time, Townsley could have made the right choice and stopped selling Biolizer XN, but it is clear that he was motivated by one thing – greed. Despite the way his actions were undermining the integrity of the organic agriculture industry in which he elected to do business and the fact that he was placing his organic farmer customers at tremendous financial risk, Townsley continued to cheat his customers for more than six years in order to stay competitive in the organic fertilizer industry and keep his company afloat. Townsley only stopped the fraud when he was finally caught.

## 2.   *Seriousness of the Offense*

The impact of Townsley's fraud was far-reaching. The government has submitted statements regarding the depth and extent of the impact of Townsley's fraud on the organic

farming industry as exhibits to this memorandum.  As seen in the submissions to the Court, the entire organic supply chain was affected.  The growers suffered both actual, pecuniary harm, as well as non-pecuniary harm.  Other organic fertilizer companies have been impacted.  The agencies that regulate the organic industry, and the certifiers and associations whose role it is to certify certain products or inputs as compliant with the NOP were affected.  Lastly, there was an impact on the consumer.  The $2.5 million out of which Townsley cheated his customers by substituting cheaper conventional fertilizer for organic-compliant fertilizer accurately measures the financial loss to the victims of his fraud scheme.  However, the ripple effects and the greater impact of this fraud show that the seriousness of this offense cannot be measured by the pecuniary harm to the farmers alone.  These facts should be considered for purposes of sentencing.[2]

To demonstrate the seriousness of Townsley's offense, including the significant impact his fraud had on the organic industry, the government submits several letters from various entities.  The first two submissions are from growers, in particular, Earthbound Farms, which is one of the largest organic producers in California and the country's leading grower of organic salads, fruits and vegetables, and Tanimura & Antle, which was the largest purchaser of Biolizer XN during the relevant time period, and one of the largest private growers/shippers of fresh vegetables in the world.  The government also provides letters from entities directly involved with organic production, specifically, the United States Department of Agriculture ("USDA"), OMRI, CDFA, and California Certified Organic Farmers ("CCOF").  Lastly, the government provides an unsolicited letter that it received in May of this year from the company Advanced Marine Technologies ("AMT"), an organic fertilizer company with which the government was

---

[2] To the extent that Townsley objects to the Court's consideration of this relevant evidence, the government submits that such an objection is in direct conflict with paragraph 8 of the Plea Agreement, which states "I agree that, regardless of any other provision in this Agreement, the government may and will provide to the Court and the Probation Office all information relevant to the charged offense or the sentencing decision." Exh. 1 at ¶ 8.  Such a position would also contravene the statutory obligation of the Court, pursuant to 18 U.S.C. § 3553(a) to consider a wide range of factors in determining the proper sentence.

1    not familiar previously.  According to AMT's Director Jeff Young, AMT not only complained to

2    OMRI regarding the fraudulent nature of Townsley's Biolizer XN during the time that Townsley

3    was committing the fraud, but the company is now subject to heightened regulations and, as a

4    result, greater costs to produce its organic fertilizer.  The author attributes these consequences

5    directly to Townsley's fraudulent conduct.

6                  **a.**    ***Growers Suffered Both Pecuniary and Non-Pecuniary Consequences***

7          In addition to the $2.5 million loss the Court determined growers suffered from

8    Townsley's fraud, which alone demonstrates the seriousness of the offense, there was also non-

9    pecuniary harm to growers.  While this non-pecuniary harm does not impact the loss calculation

10   under 2 B1.1,[3]  it nonetheless should be considered when analyzing the seriousness of the

11   offense.  In addition to the loss that resulted from paying for a fertilizer that they thought was

12   organic when it was not, organic farmers also suffered loss of consumer confidence, risk of

13   decertification, and increased costs due to new state regulations enacted because of the Townsley

14   case.

15         It is clear from the government's submissions that the loss of consumer confidence as a

16   direct consequence of Townsley's acts was a huge concern to the growers who purchased

17   Biolizer XN.  As Earthbound Farms noted, "there was also damage to the reputation of

18   companies who were the victims of this fraud, despite the fact that we were *victims.*"  *See* Letter

19   from Earthbound Farms, attached hereto as Exhibit 2 [emphasis in original].   Kerry Varney, the

20   Executive Vice President of Tanimura & Antle, one of the largest purchasers of Biolizer XN,

21   stated "[a]s an industry leader in organic farming, our reputation was tarnished along with the

---

23          [3]       The definition of "victim," for purposes of § 2B1.1, is defined as "any person who
24   sustained any part of the actual loss determined under subsection (b)(2) or any person who
     sustained bodily injury as a result of the offense."  *See* App. N. 1.  The "actual loss" is the
25   pecuniary harm that is "monetary or readily measurable in money."  It does not include
     emotional distress, harm to reputation, or other non-economic harm.  *See* App. N. 3(A).  Based
26   on that definition, it is clear here that the number of victims for purposes of § 2B1.1(b)(2) is
27   more than 10, but less than 50.  These victims are the growers who bought Biolizer XN, in a
     measurable amount, and thought that what they were purchasing was compliant with organic
28   standards.

1  entire industry when this scandal unraveled."  *See* Letter from Tanimura & Antle, attached

2  hereto as Exhibit 3.  Mr. Varney went on further to say,

> One man's greed could have caused the breakdown of the entire industry.  The consumer
> pays a premium for organic produce.  When the consumer feels that they were
> hoodwinked, they punish the industry by not buying the products.  Through our
> investment in Earthbound [Farms], we invested heavily in sustaining the brand and
> developing the option of organics.  The growth of organic salads shows how the
> investment paid off.  Again, losing consumer confidence is detrimental not only in the
> short term, but also in the long term.

7  *Id.*

8       The risk of decertification that Townsley's actions imposed on these growers should also

9  be considered.  Townsley, through his fraudulent behavior, exposed all of the growers who

10  purchased Biolizer XN and used it on their crops to the risk of losing their organic certification

11  for three years.  Specifically, because their soil was contaminated with prohibited chemicals,

12  they could have been required to go to the expense of farming the soil for three years in a totally

13  organic-compliant manner, yet would not have been permitted to market the produce as certified

14  "organic" and obtain the premium prices for organic produce during those years.  While in the

15  end none of the growers were decertified, the risk of tremendous financial harm created by

16  Townsley's actions adds to the seriousness of his criminal conduct.  As Earthbound Farms noted,

> ...[T]he graver concern was how the National Organic Program and the certifiers would
> handle this situation.  We were certainly concerned that the certifiers could rule that all
> land on which this product was used would have to go back through the 3-year transition
> process, as if it were conventional.  The would have been devastating to our business and
> to the businesses of many organic growers in California, effectively taking us all
> completely out of the organic production for three years.  Very few of the businesses
> would have been able to survive that blow and there would have been significant
> contraction of availability of organic fruits and vegetables in stores through the country
> (most of the country's organic produce is grown in California).

*See* Exh. 2.  Mr. Varney of Tanimura & Antle also described the potential consequences of the

fraud,

> The potential consequences of this illegal act were bigger than one can imagine.  We
> spent millions of dollars transitioning our ground to organics, developing our organic
> farming techniques, and investing in the organic model.  This act could have single
> handedly destroyed our entire investment.

*See* Exh. 3.

1    Lastly, as a direct result of Townsley's fraud, new regulations were enacted by the

2    California legislature.  Specifically, CDFA sponsored and enacted AB 856 (Ch. 257, Stats. of

3    2009), which permitted CDFA to expand its inspection program by increasing the fee cap on

4    conventional products and establishing a new fee specifically for organic products.  *See* Letter

5    from CDFA, attached hereto as Exhibit 4, at p. 3.  This new program is focused on the review,

6    inspection, and testing of fertilizer input materials, specifically concerning organic products.  *Id.*

7    These costs have been passed on to the organic industry, including both growers and other

8    organic fertilizer companies.  *See* letter from AMT, attached as Exhibit 5 (noting how AMT, an

9    organic fertilizer company, is now subject to stricter label requirements and costs of registering

10   their material have increased annually by 1,000%).[4]  CDFA estimates the increased cost to the

11   organic industry is $400,000/year.  *See* Exh. 4 at p. 3.  In addition, the USDA also enacted a new

12   policy requiring inspection of documentation of all liquid fertilizer manufacturers with a product

13   over 3% nitrogen. *See* Letter from USDA, attached hereto as Exhibit 6.   The government

14   recognizes that the costs associated with these additional regulations are not included in "loss"

15   for purposes U.S.S.G. § 2B1.1 and the applicable base offense level.  This information is

16   nevertheless relevant because it illustrates the far-ranging impact and financial repercussions of

17   Townsley's criminal conduct.

18                     **b.       *The Fraud was Passed Through to Consumers***

19        This Court properly found that the loss for purposes of calculating the base offense level

20   was approximately $2.5 million, the difference between what Townsley's customers paid for

21   what they thought was organic-compliant fertilizer and the cheaper conventional fertilizer that

22   Townsley gave them.  In the words of the Sentencing Commission, "loss serves as a measure of

23   the seriousness of the offense and the defendant's relative culpability..." U.S.S.G.

24

25   _____

26        [4]       The government submits the letter from AMT to demonstrate the extent to which
     this fraud affected others; it is not intended to have any effect on the loss calculation here or
27   number of victims especially since there has been no actual proof that AMT suffered a direct loss
     from Townsley's fraud.  The letter is relevant, however, to demonstrate the seriousness of the
28   offense.

§ 2B1.1, Background Note.  Through the fortuity of Townsley not getting caught for a number of years, Townsley's customers did not realize that they had been cheated and unwittingly used the conventional fertilizer to grow their crops.  They then sold their produce as organic and obtained the premium prices commanded by organically-grown produce.  Townsley's farmer customers not only passed on the fraud, albeit unwittingly; they also passed on the financial loss to their customers.

Consumers who purchased produce from an organic farm that used Biolizer XN purchased the produce at a higher price than they should have because they believed it fully complied with organic regulations.  Because there was never a reasonable means by which to identify these consumers or otherwise quantify the financial harm they suffered by paying organic produce prices for non-organic produce, they were not included as for purposes of determining loss or the number of victims enhancement under § 2B1.1.  Nonetheless, the fact that the growers passed Townsley's fraud on to the consumers is a consequence that cannot be ignored when analyzing the seriousness of the offense.  The number of defrauded consumers, from 2000 through 2006, would have been great, especially given the size of some of the growers, such as Earthbound Farms, which sold produce grown with Biolizer XN.

Moreover, there is an additional impact to consumers that resulted from this fraud.  As seen in press reports and letters provided to the Court, this fraud resulted in a loss of public confidence in the integrity of the organic farming industry and the nascent regulatory system overseeing that industry.  As Townsley's fraud became public, people became skeptical as to whether or not the produce they purchase at a higher price is truly organic.  As Earthbound Farm stated,

> Earthbound Farm, along with others, spent months responding to reporter inquiries and consumer inquiries about this situation.  Consumers were angry and we had to do quite a bit of reputation-mending with both consumers and also our retailer and foodservice customers as a result.

Exh. 2.

///

///

1
          **c.**      ***Townsley's Fraud Impacted the Regulatory Scheme***

2
       The gravity of Townsley's crimes is further illustrated by the impact his fraud had on

3
OMRI[5] and CCOF.[6]   As OMRI notes in its letter, not only did Townsley's fraud have

4
"ramifications throughout the entire organic food chain," but OMRI itself was highly criticized

5
for certifying Townsley's product and had its reputation questioned openly in California Senate

6
hearings as well as other public arenas.  *See* Letter from OMRI, attached hereto as Exhibit 7.

7
CCOF also discusses the criticism they received after the fraud became public given their role as

8
certifiers.  *See* Letter from CCOF, attached hereto as Exhibit 8.   Moreover, had decertification

9
occurred, OMRI and certifiers could have faced significant financial exposure for their role in

10
certifying a fraudulent company and the organic farmers' reliance on that certification.

11
       As seen in the letters attached, Townsley's actions unquestionably affected the entire

12
supply chain of organic production.  As Earthbound Farms stated:

13
    People who buy and companies who produce certified organic food depend on the integrity
    and honor of all the people in the supply chain because regardless of how much certification

14
    we have, craven profiteers will find a way to cheat the system....[Townsley] took advantage
    of that environment of trust and undermined the credibility and integrity of organic

15
    production.

16
Exh. 2.

17
       In light of the fact that Townsley cheated his organic farmer customers out of $2.5

18
million and the range of harmful consequences to all components of the organic farming

19
industry, the nature and seriousness of Townsley's conduct must be properly reflected in the

20
sentence this Court imposes.  A 46-month sentence fulfills that goal.

21

22
     [5]     OMRI (Organic Materials Review Institute) is a non-profit organization the

23
"primary mission" of which is "to provide professional, independent, and transparent review of

24
materials and compatible processes allowed to produce, process, and handle organic food and
fiber."  *See* Govt's Exhs. In Support of Opp. To Mot. To Dismiss Counts 9 & 10, docket 43-1, at

25
p. 115.

26
     [6]     CCOF (California Certified Organic Farmers) is an organic certification and trade

27
association that provides services to farms, processors, brokers, and retailers of organic products.
Govt Legal Memo Re Loss, Exh. 2.  CCOF is accredited by the USDA NOP to act as its agent to

28
inspect and certify farms as complying with the NOP regulations for organic production.  If
farmers obtain CCOF certification, they may sell their produce as "organic."

3.         *Deterrence and Consistency in Sentencing*

         a.         *Deterrence*

Despite the public and private financial resources that are put into regulation of the organic farming industry, at the end of the day, the integrity of the system relies largely on the honesty of the participants.  This case is a vivid example of the profound damage to the integrity of, and confidence in, an industry when one participant is dishonest and places personal gain over all other interests.

Given the seriousness of this offense and its far-reaching impacts, including the creation of new legislation in California to better uncover and prosecute this kind of fraud, the sentence that this Court imposes in this case is of paramount importance.  As is made clear in the letters provided, both the regulatory authorities and the organic industry is watching this case.  A strong message needs to be sent not only to the defendant here, but to the entire regulated community that this kind of fraud will not only be prosecuted if uncovered, but will result in significant prison time.  Conversely, a lenient sentence would have the undesired effect of undermining compliance and enforcement efforts by conveying that even when failure to comply with regulations rises to the level of criminal conduct, the Court does not view that as either serious or important.

Such deterrence is especially needed in the type of regulated industry one sees here where compliance is based on self-certification.  The reason Townsley was able to perpetuate the fraud for as long as he did was that OMRI relied solely on Townsley's own representations to certify his product as NOP compliant.  It is not uncommon in a world of limited government resources and industry lobbying to have regulatory schemes that rely on this kind of self-certification to ensure compliance. Various environmental regulatory schemes, for example, often rely on self-certification to ensure compliance.  It is in this type of regulatory environment, however, where strong enforcement is most essential.  Those regulated entities, upon whose truth-telling we rely to ensure they are complying with applicable regulations, need to know that if you lie or cheat, and you are caught, you will go to prison.  A strong sentence here will not only provide deterrence to Townsley committing such a crime again, but will likely affect

decisions of other similarly-situated participants in the organic industry.  When tempted to cheat, and making a cost-benefit analysis as to whether it is worth it, a person may well decide that a multi-year federal prison sentence is not worth it.  Accordingly, we do not agree with Probation that a 12-month sentence will suffice.  A six year fraud, which accumulated over $6.5 million in revenue, kept Townsley's business from going under, caused a loss greater than $2.5 million, and had consequences that reverberated throughout an entire industry, demands substantially more than a one year sentence.  As Mr. Varney of Tanimura & Antle stated in his letter for the Court:

> You as the judge need to send a strong message that this behavior is unacceptable.  We have no personal vendetta against Mr. Townsley, but are very concerned about the fall-out from this horrible situation.  My staff invested many hours and resources gathering data to support the prosecution's case.  We did this to protect the industry.  We look to you to enforce the law and send a very clear message that standards must be followed in order to maintain consumer confidence.

Exh. 3 at p. 2.

As Miles McEvoy, the head of the USDA's National Organic Program states:

> As the NOP has limited resources to prosecute fraud, it is critical that operators guilty of criminal fraudulent activity face substantial consequences.  Such consequences support the Agency's efforts to maintain consumer confidence that NOP compliance and enforcement actions are thorough, responsive, and consistent.  Public, substantive consequences also work to deter violations and prevent fraud throughout the organic food industry.
>
> ....Violators such as the defendant cause organic farmers and processors direct economic harm by selling non-compliant fertilizer as organic-compliant.  Strict sentencing here will validate the Agency's priorities of enforcing the USDA organic regulations, ensuring organic integrity and protecting consumers from mislabeled products.  Such sentencing of fraudulent actors should reflect and reinforce this stewardship of the public good.

*See* Exh. 6.

This case has already been well-documented in newspaper articles, trade journals and agency publications.  *Id.*  As CDFA states, its staff is in constant communication with the industry and they are often asked – "Will [Townsley] only receive a slap on the wrist?"  *See* Exh. 4.  As Peggy Miars, the Executive Director and CEO of OMRI advises in her letter, a sentence with significant prison time can very well "act to discourage those who might consider fraudulent enterprises that target the organic industry."  *See* Exh.7.

///

1

         **b.**    ***Consistent Sentencing***

2

      A sentence of at least 46 months in prison is also necessary to ensure there is consistency

3

and uniformity in sentencing and to "avoid unwarranted sentence disparities among defendants

4

with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

5

The government is aware of two other recent federal cases with similar facts where the defendant

6

sold a product as organic when he knew it was not organic and the sentence or likely sentence is

7

within the Guideline range.[7]

8

      The first case arises out of the District of Oregon.  In April 2012, the Court sentenced the

9

defendant in *United States v. Harold Chase*, Case No. 6:11-CR-60133-AA, to 27 months

10

imprisonment – the low-end of the Guideline range  – for selling more than 4 million pounds of

11

conventional corn falsely labeled as organic corn to organic producers.  During the six month

12

period of this fraud, the producers then sold supposedly organic compliant product to consumers

13

when it was not.  According to the government, by falsely labeling the conventional corn as

14

organic, the defendant "instantly almost doubled the sales price – that is, he received more than

15

$450,000 for the falsely labeled conventional corn when its real value was approximately

16

$260,000 – and therefore his potential profits."  *See* Govt's Sentencing Memorandum, attached

17

as Exhibit 10, at p. 2.[8]  The government recommended, and the Court agreed, that a Guideline

18

sentence of 27 months was appropriate.  In its sentencing memorandum, the government, as it

19

does here, discussed the seriousness of the offense, including the facts that the purchasers of the

20

non-organic corn could have lost their organic certification and countless consumers in the end

21

were defrauded when they paid premium organic prices for the non-organic products.  As here,

22

the government acknowledged that quantifying the latter harm was not possible.  Exh. 9 at p. 4.

23

---

24

     [7]      According to a press report on the Oregon case cited herein, there have only been

25

five similar prosecutions preceding the cases cited in this section. *See* "Organic or Conventional?
Man Faces Prison for Corn Caper," KVAL 13, Dec.6, 2011, attached hereto as Exhibit 9.  Given

26

the relatively nascent nature of organic regulations, which took years to implement after passage

27

of the Organic Production Act in 1990, it is not surprising that enforcement actions are only now
appearing.

28

     [8]  The Information in the *Chase* case is attached as Exhibit 11.

1    Here, Townsley perpetuated the fraud not for six months, but six years.  The loss figure here is

2    also much greater, which further supports the government's recommendation of 46 months, as

3    opposed to the 27-month sentence in the *Chase* case.

4         The second case, with almost the exact same facts as seen here, is currently pending in

5    federal court in California.  The case arises out of the Eastern District of California and the

6    defendant is scheduled to be sentenced in the next several weeks.  On August 3, 2012, defendant

7    Kenneth Nelson, Jr. pleaded guilty to four counts of mail fraud in connection with his six year

8    scheme to defraud organic growers by selling a fertilizer he represented was organic (made with

9    fish meal and bird guano), when the fertilizer contained prohibited materials such as aqua

10   ammonia, ammonium sulfate, and urea.  *See United States v. Kenneth Nelson, Jr.* , Memorandum

11   of Plea Agreement Pursuant to Rule 11(c) of the Federal Rules of Criminal Procedure, Case No.

12   1:11-CR-0096 AWI, Doc. 27, attached as Exhibit 12.   In that case, the parties agreed that the

13   gross revenues were $40 million and the profit to Nelson's company, Port Organic Products,

14   Ltd., was $9 million.  *Id.*  The parties also agreed the loss for purposes of calculating the

15   Guideline under §2B1.1, would be $40 million, which represented what the organic growers paid

16   for the fraudulent product.  *Id.*  As a further part of the Plea Agreement, the parties agreed to a

17   Guideline sentence.  *Id.*  This means that should the Court accept the terms of the Plea

18   Agreement, the defendant will be sentenced to a minimum of 78 months, but it could be higher

19   depending on the Court's determination as to certain specific offense characteristics.  Here,

20   Townsley perpetuated his fraud for a similar amount of time, but it resulted in a significantly

21   lower loss figure and lower gross sales than Nelson's fraud.  The government submits that a 46-

22   month sentence here (as opposed to the possible minimum 78-month sentence for Nelson)

23   reflects the unique facts of this case, while still ensuring there is consistency and uniformity of

24   sentencing for similarly-situated defendants.

25        **4.**     ***Protecting the Public From Similar Crimes of Defendant***

26        A 46-month sentence is necessary not only for the reasons stated above, but also to

27   ensure that the defendant appreciates the seriousness of his crime and to ensure that he will not

28   commit such a crime again.  While Townsley has entered a Plea Agreement wherein he admitted

to knowingly engaging in a scheme to defraud, his actions since entering the Plea Agreement have caused the government some concern.  For example, according to the PSR, when he was interviewed by the Probation Officer, Townsley appeared to be backing away from what he admitted in the Plea Agreement and in entering his plea before this Court, stating now that he did not know that (1) the Ajinimoto product that he first substituted into Biolizer XN contained the prohibited substance ammonium chloride, and (2) that the ADM product that he next substituted into Biolizer XN contained the prohibited material ammonium sulfate.  *See* PSR at ¶ 21.  These statements are in direct contravention of what Townsley admitted in the Plea Agreement. Specifically, in paragraph 2 of the Plea Agreement, among other things, Townsley admitted:

> As part of the scheme, in approximately April 2000, I knowingly changed the ingredients for the manufacture of Biolizer XN from fish and feathermeal to a product that contained ammonium chloride, an ingredient prohibited for use in organic farming.  I did not notify OMRI of this change as required by OMRI.

*See* Exh. 1 at ¶ 2(g).

He then admitted  in paragraph 2(h) of the Plea Agreement:

> As a further part of the scheme, in June 2001, I again knowingly changed the ingredients for the manufacture of Biolizer XN by substituting the product that contained ammonium chloride for a product that contained ammonium sulfate, an ingredient that could not be used by growers as an input in organic farming.  I did not notify OMRI of this change and I continued to submit forms to OMRI for the annual renewal of Biolizer XN's OMRI listing, which I signed, that certified that the information initially submitted for Biolizer XN had not changed.

*Id.* at ¶ 2(h).  Given Townsley's statement to the Probation Officer, the government is concerned that Townsley is not acknowledging the full extent of his wrongful actions and does not fully appreciate the seriousness of his actions.  There is certainly no expression of contrition or regret for the harm and consequences of his actions.

These concerns first arose during the briefing the parties undertook regarding the determination of loss.  As the Court noted in its Order Re Calculation of Loss:

> As an initial matter, Defendant spends much of his briefing running away from his plea and the facts and evidence as presented in this case.  In the initial briefing regarding the loss calculation, Defendant argues that (1) he did not know the new inputs contained prohibited synthetic materials, (2) that the HTLC process somehow rendered the synthetic iniputs "organic." [citations omitted]  In his supplemental briefing, Defendant presents an alleged expert declaration offering the opinion that the synthetic, purchased

fertilizer was actually an "organic" fertilizer that would comply with NOP regulations. These contentions are not supported by the evidence. Order Re Loss at p. 16.  The Court found that the evidence in this case both directly and circumstantially shows that Townsley knew the inputs were synthetic chemicals and rejected the defense's argument that these synthetic, prohibited substances were somehow rendered organic when they went through an HTLC process.  Order re Loss at pp. 16-19.  Throughout these proceedings, the government has been surprised and concerned to see Townsley back away from his admitted liability.  To the extent that these concerns are well-founded, a 46-month sentence will ensure that Townsley understands and appreciates that the acts he chose to undertake are crimes that come with substantial consequences.  Such a realization would increase the likelihood that Townsley would not undertake similar acts in the future.

**5.** *Reasons for a Section 3553 Variance*

Under Section 3553(a), the Court is required to impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing as set out in that section, and as discussed above.  Here, as in any case, the Court must balance mitigating and aggravating circumstances relating to the offense, the defendant, and societal concerns, in order to fulfill its duty.  As discussed above, there are a variety of reasons why the imposition of a substantial sentence of imprisonment is necessary in order to fulfill the purposes of sentencing.  There are also some mitigating § 3553(a) facts which support a variance below the low end of the guideline range.  First, up until he engaged in this fraud, Townsley appears to have led a law-abiding life and has no prior criminal history.  Second, in the end, Townsley's customers were not decertified and the tremendous financial risk to which Townsley exposed his customers did not materialize.

When these factors are viewed together, they warrant a three-level reduction in the base offense level from level 26 to level 23.  That results in a 46 - 57 month guideline range and provides the basis for the government's recommendation of a 46-month sentence here.  Such a sentence is sufficient, but not more than necessary, to fulfill the purposes of sentencing as set out in § 3553(a) and discussed above.

As a final note, the government submits that the one-year sentence recommended by Probation goes much too far in terms of a variance and would, in fact, undermine the purposes of sentencing.   In light of all of the concerns discussed above, there is simply no justification for the degree of leniency that Probation recommends.  As discussed above, Townsley elected to embark on a course of committing fraud in order to keep his business afloat, and over the course of six and a half years, made choices to perpetuate that fraud for purely selfish, financial reasons. He did so despite the fact that he was cheating his farmer customers, exposing them to tremendous financial risk, and undermining the integrity of the organic farming industry which he professes to care about.  This was no isolated instance of fraud; it had profound ripple effects. In the regulatory context in which this crime occurred, it is imperative that the sentence convey to the defendant, all of the participants in the regulated industry, and to the consumers who rely on the enforcement of those regulations, that the Court views the violation of trust as serious and that violators will suffer real consequences.

## III.    CONCLUSION

For all of the reasons above, the United States recommends that the Court impose a sentence of 46 months, a three year term of supervised release, and a fine of $125,000.  It is the government's understanding that there is no restitution to impose.

DATED: October 31, 2012                    Respectfully submitted,

MELINDA HAAG
United States Attorney


_____/s/_____
STACEY P. GEIS
SUSAN E. BADGER
Assistant United States Attorneys