1   Evan A. Jenness (Calif. Bar No. 136822)
    Evan@JennessLaw.com
2   Law Offices of Evan A. Jenness
    2115 Main Street
3   Santa Monica, California 90405
    Telephone: 310-399-3259
4
    William J. Genego (Calif. Bar No. 103224)
5   Bill@GenegoLaw.com
    Law Offices of William Genego
6   2115 Main Street
    Santa Monica, California 90405
7   Telephone:  310-399-3259

8   Counsel for Defendant
    Peter Townsley
9

10                    **United States District Court**

                  **Northern District of California**
11

12   UNITED STATES OF AMERICA   )    No. CR 10-0428 CRB
                                 )
13               Plaintiff,      )    Peter Townsley's Sentencing
                                 )    Memorandum; Exhibits
14                               )
          vs.                    )
15                               )    Date:      November 7, 2012
                                 )    Time:      2:00 p.m.
16   PETER TOWNSLEY,             )    Place:     Courtroom 6
                                 )
17               Defendant.      )
     _____ )
18

19           Peter Townsley, by counsel, concurs in the sentencing recommendation

20   of the Probation Officer (hereafter referred to as the "recommended sentence")

21   and requests that it be imposed by the Court.  The accompanying

22   memorandum and exhibits are respectfully submitted regarding sentencing.

23   Dated:___10/31/2012___          Signed:___/s/ *Evan A. Jenness*___

24

25   Dated:___10/31/2012___          Signed:___/s/ *William J. Genego*___

26                                        Attorneys for Peter Townsley

27

28

# Table of Contents

Table of Authorities ............................................................................................. iii

I.    Introduction .......................................................................................... 1

II.   The Sentence Recommended by the Probation Officer is
      Well-Supported................................................................................. 4

III.  Sentencing Factors Analysis ................................................................ 5

      A.    The Nature and Circumstances of the Offense are Highly
            Unusual and Support Leniency ....................................................... 5

      B.    Peter Townsley's History and Characteristics
            Support Leniency .......................................................................... 8

      C.    The Four Purposes of Sentencing Support the Recommended
            Sentence ...................................................................................... 13

            1.    Retribution.............................................................................. 13

            2.    Specific Deterrence ................................................................ 14

            3.    General Deterrence ................................................................ 15

            4.    Rehabilitation ....................................................................... 17

      D.    The Kinds of Sentences Available ................................................ 19

      E.    A Guideline Sentence Would be Disproportionate to the Offense
            and Inconsistent With the Purposes of Sentencing ..................... 19

      F.    The Sentencing Commission's Policy Statements ....................... 21

      G.    The Recommended Sentence Would Avoid Unwarranted
            Sentencing Disparities ............................................................... 22

      H.    The Parties Agree That No Restitution is Owed .......................... 23

IV.   Multiple Grounds Support a Variance Under 18 U.S.C. § 3553 ........... 24

      A.    Peter Townsley's Family Ties and Responsibilities Weigh in
            Favor of the Recommended Sentence ......................................... 24

      B.    Collateral Immigration Consequences – Deportation, Harsher
            Conditions of Confinement, and Potential Additional Detention –

Support Sentencing  Leniency.........................................................27

C.    Others' Unlawful Conduct Contributed to the Offense ...............30

D.    Overstatement of "Loss" Under USSG § 2B1.1 ...........................31

V.    Conclusion ...............................................................................34

1

# Table of Authorities

2

CASES

3

*Gall v. United States,*
    552 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

4

*Jordan v. De George,*
    341 U.S. 223 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

5

*Kimbrough v. United States,*
    552 U.S. 85 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

6

7

*Nelson v. United States,*
    555 U.S. 350 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

8

*Pepper v. United States,*
    131 S. Ct. 1229 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

9

10

*United States v. Adelson,*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

11

*United States v. Armstead,*
    552 F.3d 769 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

12

*United States v. Autery,*
    555 F.3d 864 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

13

14

*United States v. Booker,*
    543 U.S. 220 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

15

16

*United States v. Carty,*
    520 F.3d 984 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

17

*United States v. Charry Cubillos,*
    91 F.3d 1342 (9th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

18

19

*United States v. Conner,*
    537 F.3d 480 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

20

*United States v. Davoudi,*
    172 F.3d 1130 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

21

22

*United States v. Edwards,*
    595 F.3d 1004 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

23

*United States v. Kennedy,*
    554 F.3d 415 (3d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

24

25

*United States v. Lopez-Salas,*
    266 F.3d 842 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

26

*United States v. Martin,*
    520 F.3d 87 (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

27

28

*United States v. Pham,*
  545 F.3d 712 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

*United States v. Rita,*
  551 U.S. 338 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

*United States v. Ruff,*
  535 F.3d 999 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

*United States v. Ruiz,*
  2006 WL 1311982 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

*United States v. Smith,*
  27 F.3d 649, n. 2 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

*United States v. Stewart,*
  590 F.3d 93 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

*United States v. White,*
  506 F.3d 635 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

*United States v. Whitehead,*
  532 F.3d 991 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

STATUTES AND REGULATIONS

Title 8, U.S. Code

  § 1101(a)(43)(M)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

  § 1226(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

  § 1227(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

  § 1227(a)(2)(A)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

  § 1227(a)(2)(A)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

  § 1252 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

Title 18, U.S. Code

  § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

  § 3553(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

  § 3553(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

  § 3553(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

  § 3624(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

  § 3624(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

Cal. Food & Agric. Code

§ 14602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

§ 14592 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

§ 14651(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

§ 14651.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

§ 14652(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Cal. Code Reg.

§ 2322(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States Sentencing Guidelines

§ 2B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

§ 2F1.1 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

§ 3B 1.1 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

§ 3E1.1 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## OTHER AUTHORITIES

At a "Loss" for Justice - Federal Sentencing for Economic offenses, American Bar Ass'n, Alan Ellis, John R. Steer, and Mark H. Allenbaugh,
*Criminal Justice*, V. 25, No. 4 (Winter 2011) . . . . . . . . . . . . . . . . . . 20, 32

Aging Prisoners: Crisis in American Corrections, Ronald H. Aday  (2003)     14

Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates , U.S. Department of Justice, Nat'l Institute of Corrections (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed. Bureau of Prisons, Program Statement No. P5100.08, Inmate Security Designation and Custody Classification  . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Fed. Bureau of Prisons, Program Statement No. P5880.28, Change Notice Sentence Computation Manual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

How Much Do We Really Know About Criminal Deterrence?, Raymond Paternoster,
100 J. Crim. L. & Criminology 765 (2010) . . . . . . . . . . . . . . . . . . . . . . . 16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Imprisoning White-Collar Criminals?,
     23 S. Ill. U. L. J. 485 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

Management of Major Depressive Disorder, U.S. Bureau of Prisons, (August,
2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

Organic is Overrated, Henry Miller, M.D.,
     Defining Ideas (Hoover Institution, Stanford Univ., July 26, 2012) . . . . .   7

Prison Types & General Information, U.S. Dept. of Justice, Fed. Bureau of
Prisons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

Punishment Purposes, Richard Frase,
     58 Stan. L. Rev. 67 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

Sacrificial Felon, Frank Bowman,
     The American Lawyer (Jan. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

Selecting & Using Organic Fertilizers, Koenig & Johnson,
     Utah State Univ. Cooperative Extension . . . . . . . . . . . . . . . . . . . . . . . .   8

Stanford Study Finds Little Evidence of Health Benefits from Organic Foods,
Michelle Brandt,
     Stanford School of Medicine (Sept. 3, 2012) . . . . . . . . . . . . . . . . . . . . . .   7

The Criminal History Computation of the Sentencing Guidelines, Research
Series on the Recidivism of Federal Guideline Offenders, Measuring
Recidivism . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

USDA Inspector General Finds Bush Administration Ignored Organic Laws;
New Management at USDA Reforms, Strengthens National Organic Program
     The Cornucopia Institute, March 18, 2010 . . . . . . . . . . . . . . . . . . . . . . .   2

USSC Results of Survey of United States District Judges January 2010
through March 2010 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

USSC Statistical Information Packet FY 2011 (9th Cir.) . . . . . . . . . . . . . . .   21

USSC Statistical Information Packet FY 2011 (N.D. Cal.) . . . . . . . . . . . . .   23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

White-Collar Defendants and White-Collar Crimes, Andrew Weissmann & Joshua Block,
    116 Yale L.J. Pocket Part 286 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**SENTENCING MEMORANDUM**

## I.    Introduction

Peter Townsley entered the fertilizer business with the best of intentions - to use an innovative technology to create organic fertilizer through a process that would pasteurize the material thereby reducing the potential for harmful pathogens that can infect agricultural products and endanger the food supply.  His company manufactured nine different fertilizers at its height of operations - one ran afoul of regulatory requirements and led to his offense conduct.  He has pled guilty and admits his wrongful conduct - misrepresenting the ingredients in Biolizer XN to customers and the Organic Materials Review Institute (OMRI).

Although Mr. Townsley's plea was limited his misrepresentations to OMRI that Biolizer XN's ingredients had not changed, and his continued use of an outdated and incorrect product label after the ingredients had changed, he also acknowledges he did not follow the rules and procedures needed to have Biolizer XN be deemed organic under the law, and that this was wrong, regardless of his belief in the superiority and safety of the product.

But, the intent in his heart was not simply to profit through deception. If it were, he would have purchased cheap ammonium sulfate (conventional fertilizer) from a local agricultural supply house and re-labeled it.  He would not have done what he did in this case - traveled the country searching for a suitable input to manufacture fertilizer using the digester technology his father and two other professors had designed for the production of pathogen-free organic fertilizer.  He would not have stopped using an input from Ajinomoto when he learned it was processed with hydrochloric acid.  He would not have incurred the high costs of shipping that product from Iowa, or the greater costs of shipping the subsequent input from ADM in Illinois.

1   There was a much easier and profitable way to commit the crime if that had

2   been Mr. Townsley's plan.  The facts in this case are more complicated.

3       The crime Mr. Townsley committed, and to which he has pled guilty,

4   was deceiving OMRI by failing to apprise it when he changed the formulation

5   of Biolizer XN, and deceiving customers by falsely labeling Biolizer XN.  He

6   will forever regret misleading OMRI and his customers.  He will forever

7   regret cutting corners by not ensuring his fertilizer inputs were suitable,

8   informing OMRI of reformulations of Biolizer XN, and correctly labeling the

9   product.  His violations were serious.  However, this case would be most fairly

10  viewed in context - in light of Mr. Townsley's background, the unique

11  environment in which the offense occurred, and the highly unusual facts and

12  circumstances.

13      With an electrical engineering background, Mr. Townsley had great

14  affection for science and tinkering and hoped to bring to market the fruits of

15  his father's technology.  Those things got the better of him as he modified the

16  ingredients in Biolizer XN without informing OMRI or his customers.  He also

17  perceived the regulatory environment of the organics industry during the

18  relevant time period - 2001 through 2006 - to be a very relaxed one.  This

19  perception is validated by recent publications describing a crack-down on

20  organics violations that did not begin until 2010 - long after CLF had closed.[1]

21

22  _____

23  [1]   *See* USDA Inspector General Finds Bush Administration Ignored
    Organic Laws; New Management at USDA Reforms, Strengthens National

24  Organic Program (The Cornucopia Institute, March 18, 2010) (describing
    a March 9, 2010 report of the Office of Inspector General which conducted an

25  "audit and investigation of alleged improprieties at the USDA's National
    Organic Program . . . substantiating the allegations of prominent organic

26  industry watchdog groups — that under the Bush administration, the USDA

27  did an inadequate job of enforcing federal organic law."), at:
    http://www.cornucopia.org/2010/03/usda-inspector-general-finds-bush-admini

28  stration-ignored-organic-laws/ (the article links the complete OIG report).

He did not view OMRI with the solemnity of a government agency (which it wasn't).  While he greatly regrets that he failed to consider the potential risk to his customers, the possibility of farms being decertified because of using Biolizer XN was not on his mind (and indeed did not come to pass).[2]  He did not believe the environment, or any end consumers' health, could be adversely affected (and indeed there is no evidence that the use of Biolizer XN did have, or could have had, any such effects).

> As stated by Mr. Townsley in his letter to the Court:
>
> "I deeply regret my actions and I am ashamed of the embarrassment I have brought upon my family. . . . [F]ood safety aspects were the primary driving force behind my desire to have this system adopted within the agricultural industry when I first decided to get into the organic fertilizer business. . . . invested a lot of time, effort and energy into this process and I honestly believed that one day it could be the benchmark for all organic fertilizer production. . . .  What I did was wrong and I knew that I should have informed OMRI. . . .  I sincerely wish I could turn back the clock, and either correctly register these inputs, or never use them in the first place.  My experience with the various individuals within OMRI was always positive and I truly regret casting a shadow over an organization that has worked hard to advance the organic industry."

*See* Exh A.

---

[2]  Whether growers who used Biolizer XN faced decertification as a practical matter is unclear given the findings of the OIG's March, 2010 report that the USDA was not fully enforcing organics laws and that California's organic program, in particular, was not properly equipped to enforce national organics laws.  *Id.*

1    As reflected in the many additional accompanying letters to the Court,

2    Mr. Townsley is a humble, gentle, generous and thoughtful soul.  He drives

3    an old truck, has never lived a lavish lifestyle, has been caring for his aging

4    parents and supports other family members, and is deeply sorry for his

5    offense  *See* Exh B.  He has no prior record and has led a law-abiding life for

6    over half a decade since the offense conduct concluded.  He accepts

7    responsibility for his wrongdoing, and apologizes for it.  His fundamental

8    honesty is reflected in the letters to the Court from those who know him well.

9    His repeated return to this Court although he has been living in Canada, and

10   his full cooperation in the presentence process, further reflect is integrity and

11   good character.  In sum, sentencing leniency is amply supported.  As his wife,

12   Lorena Townsley, states in her letter to the Court, "I know Peter is a man

13   with an honest heart. . . . I hope you can see Peter as the good person that he

14   is."

15   In light of the unusual facts and circumstances involved, Peter

16   Townsley states:

17        "I am asking for the court's understanding and for leniency, I can

18        assure all involved that I have learned a very painful lesson and I

19        will never run afoul of the law again."

20   Exh A.

21   **II.     The Sentence Recommended by the Probation Officer is Well-**

22   **Supported**

23   The sentence recommended by the Probation Office is appropriate and

24   in accordance with the purposes of sentencing because it is "sufficient, but not

25   greater than necessary" to satisfy the purposes of sentencing: retribution (to

26   "reflect the seriousness of the offense" and "provide just punishment"),

27   "adequate deterrence," "respect for the law," incapacitation ("to protect the

28   public from further crimes of the defendant"), and rehabilitation ("to provide

1  the defendant with needed educational or vocational training, medical care,

2  or other correctional treatment in the most effective manner").

3      It also reflects a reasoned application of sentencing considerations: the

4  nature and circumstances of the offense and the history and characteristics of

5  the defendant; the kinds of sentence available; the advisory Sentencing

6  Guidelines and policy statements of the Sentencing Commission; the need to

7  avoid unwarranted sentencing disparity; and the need to provide restitution

8  where applicable. 18 U.S.C. § 3553(a)(3), (a)(5)-(7).

9  **III.    Sentencing Factors Analysis**

10      A.    *The Nature and Circumstances of the Offense are Highly Unusual*

11          *and Support Leniency*

12      Peter Townsley is the former owner of California Liquid Fertilizer, Inc.

13  (CLF), which manufactured a line of proprietary organic liquid fertilizers for

14  sale to commercial growers from 1999 until the company closed in 2007. The

15  company dates back to 1988, when it was known as Thermophilic Waste

16  Systems, a company that marketed a biodegradable organic waste conversion

17  technology that had been developed by Peter Townsley's father, and two other

18  professors. Peter Townsley was the only employee. In 1997, the company

19  became California Liquid Fertilizer, Inc., and a small facility was built at a

20  local fish plant in Salinas, California. The waste conversion technology was

21  developed further, and Mr. Townsley began marketing a fish product to the

22  local agricultural community, which used it for fertilizer. In 1998, CLF hired

23  its first employee, and Mr. Townsley continued to develop fertilizers in the

24  following years. This case concerns Biolizer XN, which was one of the nine

25  liquid fertilizers manufactured by CLF.

26      Mr. Townsley entered the fertilizer business intending to manufacture

27  an improved fertilizer for organic production. Using the technology his father

28  had initially developed, his plan was to manufacture organic fertilizer

1   through a process that would kill pathogens such as E. Coli and Salmonella, a

2   persistent problem with organic produce, and improve soil conditions.

3       Initially, Biolizer XN was manufactured as labeled - using fish and

4   feathermeal as ingredients. "However, when the farmers indicated that the

5   fertilizer was too thick to run efficiently through their irrigation systems, he

6   chose to change the ingredients, which technically rendered the fertilizer as a

7   non-organic product." PSR ¶ 18 (information provided by the case agent). As

8   found by the Probation Officer:

9       "In this case, it does not appear that Townsley initially set out to

10      defraud his customers in a traditional sense (*i.e.*, he did not

11      simply package traditional fertilizer and sell it as organic, but

12      rather, he developed specific machinery with the intention of

13      attempting to process and develop organic fertilizer, which turned

14      out to be too thick to flow efficiently through the farmers'

15      irrigation systems). The defendant has no prior history of law

16      enforcement contacts, and by all accounts, he has been leading a

17      law-abiding lifestyle. . . .  The defendant is an educated individual

18      with a long history of verifiable employment.  As a citizen of

19      Canada, he will lose his ability to live and/or work in the United

20      States, based on this felony conviction. There is also no indication

21      that the defendant has procured any significant, long-term

22      financial gain from his criminal conduct. . . . Additionally, the

23      defendant's immigration status and ability to take care of his

24      elderly parents will be impacted by a custody sentence.

25  Id. ¶ 83; *see also* ¶ 21.

26      The Presentence Report makes no finding about whether the use of

27  Biolizer XN had, or non-organic fertilizer generally has, any adverse overall

28

environmental and/or health effects.[3]  However, it merits considering that the vast majority of farms in the United States use conventional (not organic) fertilizer and the overwhelming majority of agricultural products consumed in this country are grown with conventional inorganic fertilizer.  According to the USDA, less than 1% of U.S. cropland was certified as organic in 2008, and the figure was just .46% in 2005.[4]  Media accounts abound about the claimed benefits of organic products, and the issue generates passion amongst some who believe organic products are superior.  But, science has not validated the claims.[5]  Moreover, the "USDA makes no claims that organically produced food is safer or more nutritious than conventionally produced food."[6]  When it comes to fertilizer, there is even less scientific evidence supporting claims of

---

[3]    The Presentence Report states: "The full scope of the impact, including possible health repercussions for individuals attempting to follow an organic diet, is impossible to ascertain." PSR, Sentencing Recommendation, p. 2.

[4]    USDA Economic Research Data, Table 3, at: http://www.ers.usda.gov/data-products/organic-production.aspx

[5]    *See, e.g.*, Henry Miller, M.D., Organic is Overrated, *published in* Defining Ideas (Hoover Instit., Stanford U., July 26, 2012) ("organic foods are, if anything, less safe than those made with other production systems . . . . How safe is organic food?  There have been numerous organic food recalls, including at least 20 during the past two years. Examples include Salmonella contamination . . . [and] E. coli contamination. . . .  Organic does not imply safer."), at: http://www.hoover.org/publications/defining-ideas/article/123521; Michelle Brandt, Little Evidence of Health Benefits from Organic Foods, Stanford Study Finds, Stanford Sch. of Medicine (Sept. 3, 2012) (describing "the most comprehensive meta-analysis to date of existing studies comparing organic and conventional foods," which "did not find strong evidence that organic foods are more nutritious or carry fewer health risks than conventional alternatives, though consumption of organic foods can reduce the risk of pesticide exposure.").  Pesticide is applied to crops independently of fertilizer, and is not at issue regarding Biolizer XN.

[6]    *See* http://www.fda.gov/forconsumers/consumerupdates/ucm094536.htm.

1   superiority.[7]  Given that neither the indictment nor plea agreement, nor any

2   definitive scientific studies, establish that organic fertilizer produces

3   healthier products or provides environmental benefits, the defense submits

4   that such claims not be considered for sentencing purposes.

5          In sum, the highly unusual facts and circumstances in this case

6   distinguish it from the vast majority of fraud prosecutions, and merit

7   sentencing leniency.  *See, e.g., United States v. Whitehead*, 532 F.3d 991 (9th

8   Cir. 2008) (affirming downward variance to probation, community service and

9   restitution in a case where defendant was convicted at trial of violating

10   Digital Millenium Copyright act by selling over $1 million in counterfeit

11   access cards thereby allowing customers to access DirecTV without paying for

12   it, where court found the offense "[di]d not pose the same danger to the

13   community as many other crimes"); *United States v. Edwards*, 595 F.3d 1004

14   (9th Cir. 2010) (affirming variance to probation and restitution in bankruptcy

15   fraud/false statement case, notwithstanding seriousness of offense and

16   defendant's prior felony conviction, where defendant was rehabilitated, fact of

17   conviction and probationary sentence would provide specific deterrence,

18   restitution order would have general deterrent value, and defendant was

19   unlikely recidivist).

20          B.   *Peter Townsley's History and Characteristics Support Leniency*

21          Mr. Townsley's offense was aberrant conduct - not as defined in the

22   Guidelines, but as used in common parlance: anomalous and atypical.  It

23   reflects a deviation from the long life of honesty, modesty, hard work and

24

---

25          [7]   *See, e.g.,* Koenig & Johnson, Selecting & Using Organic Fertilizers
     (Utah State Univ. Cooperative Extension) ("A common misconception is that
26   organic fertilizers are safer for plants and the environment than inorganic
     (chemical) products. . . .  Properly used, both organic and inorganic fertilizers
27   are safe for plants and the environment."), at:
28   http://www.extension.usu.edu/files/publications/factsheet/HG-510.pdf.

consideration for others - a life Peter Townsley resumed over half a decade
ago.  His mother Marion Townsley states:

> "Peter has always been honest and has always maintained his
> integrity through so many of life's situations.  The circumstances
> surrounding this case are so inconsistent with the son we know
> that it just [does] not make sense to us."

His father, Phillip Townsley, states "I know my son is a genuinely good
person," further explaining:

> " I obtained both my Masters Degree in Food Science and then my
> PhD in Biochemistry from UC Berkeley, California in 1954. . . . I
> worked for the Federal Government in Canada . . . Over my
> career I had published many papers and developed several
> patents. . . . food safety is paramount and as a microbiologist I
> sincerely felt the work my son was doing with the liquid
> composting process would become an important part of the
> industry."

Peter Townsley's sister, Beth Ostlund writes:

> "Peter has been committed for years to building a digester that
> would successfully take the discarded and turn it into a safe
> organic usable product. . . .  The same as what our father, as a
> professor in Biochemistry wanted, Peter too wanted to do
> something grand and useful for society.  He was devoted and
> hardworking, knowing that his project would make this a better
> world for all.  My brother has a very kind heart, compassionate,
> caring and thoughtful, evident when seeing how he treats our
> parents, now in their mid-80's.  He's always been sensitive to
> others, their feelings and needs.  Peter has, through his life
> touched many people and has made strong bonds.  Peter is seen

1    as sincere, credible, trustworthy and generous.  As a professional
2    Peter is polite, well-spoken, listens, is thoughtful and well-liked
3    by business associates, friends and family. . . .  Peter has no
4    greed, but is generous, is not self-fulfilling but inclusive.  Peter is
5    a positive, progressive thinker. . . . Peter has always wanted to be
6    fair, not hold onto bitterness, yet forgive and takes the high road,
7    always to be proud of who he is and his beliefs. . . .  No one that
8    knows Peter can believe what has happened to him, my brother."
9  Peter Townsley's cousin and the bond surety in this case, Brian Townsley,
10 states:

11   "I have known my cousin Peter his entire life. . . .  Our fathers,
12   who are twins, are both professionals.  Peter's father has a PhD
13   in Microbiology and my father has a Masters in Agriculture with
14   an emphasis in Chemistry; both received their degrees from Cal
15   State Berkeley.  The thought and development for the process to
16   produce organic fertilizer has been worked on for decades.  The
17   four of us have spent time discussing the process and business
18   practicalities for many years.  I know that Peter worked
19   extremely hard doing demonstrations of the process and finally
20   obtained funding to develop a full-size facility. . . .  I know from
21   the amount of work that Peter put into the process and then
22   created a business from the results of his R & D, that he never
23   intended to commit a crime.  He is remorseful for committing an
24   offense.  I am confident from our many discussions that he has
25   learned his lesson.  Peter has never been in trouble with the law
26   in the past.  I believe that he will never be in trouble with the law
27   again and is not a danger to society."
28 Peter Townsley's brother-in-law Georg Koslowski writes:

1   "The Townsley family embraces family values, the work ethic

2   with all contributing to society. . . .  A man of high ideals, working

3   for the greater good of society, Peter brought to California's

4   agriculture his vision, intellectual property, energy, money, time

5   and effort (over 10 years), developing a proven, safer, pathogen

6   killing (pathogen free), high temperature digestion technology.

7   As an entrepreneur and inventor, I say he is ahead of his time

8   safely rendering waste material into fertilizer. . . .  He was, in my

9   mind, not in it for the money.  Rather he was at the leading edge,

10  the initial days of a mostly unregulated organic industry wherein

11  consumers still died from e-coli infection.  Peter believed in and

12  made a product that could make a difference. . . .  He is a good

13  person and hard worker with a social conscience."

14  Peter Townsley's aunt, Anne MacIntosh writes:

15  "I have known Peter well for his entire life.  He is a young man

16  who has never and would never do harm to anybody for his own

17  personal gain.  He has been raised in a gentle and intellectual

18  family interested in the advancement of scientific knowledge in

19  the field of Agriculture. . . .  He feels totally responsible for the

20  situation he finds himself in, and is very sad about the ensuing

21  results."

22      In sum, the offense conduct is most fairly viewed in context: "Peter

23  Townsley is someone who leads a simple life, has an exemplary character and

24  is highly responsible."[8]  *See also* Letters from Mr. Townsley's aunt and uncle,

25

26

27

28      [8]   Letter from Peter Townsley's step-son, Hector Jose Perez Lopez.

1  Patricia and David Townsley;[9] friend Donald Le;[10] and transactional lawyer

2  Peter Casey.[11]  His background and character, as described by those who

3  know him best, weigh in support of sentencing leniency.[12]

4  　　　　C.　*The Four Purposes of Sentencing Support the Recommended*

5  　　　　　　*Sentence*

6  　　　　　　1.　Retribution

7

8

9

10  [9] "We have personally known Peter since he was born.  He was always a
thoughtful, inquisitive (liked to take things apart), child.  He was a Cub Scout

11  for many years and had an affinity for helping animals in need.  He has
always been respective and caring for others, in particular, his mother and

12  father.  He has never been in trouble in the past and we have always been

13  proud of him."

14  [10] "I first knew Peter when I represented my cousins who own one of the
largest fertilizer company in Vietnam to contact Peter for a possible joint

15  venture in Vietnam. . . .  Peter has had very good intention to help us to help

16  the farmers in Vietnam to gain more knowledge about organic fertilizer in
order to provide safer food on the table for the people in Vietnam instead of

17  contaminated food that are on the market and in the news today. . . . [M]y
cousins and I had the opportunity to work with Peter.  His integrity had

18  impressed us so much . . . The fact that Peter had violating the law is

19  inconsistent with Peter's character."

20  [11] "Since I first met and started working with Peter Townsley in 2001,
Peter has always maintained a modest, middle-class lifestyle. . . .  Peter has

21  always driven sensible vehicles including a Chevrolet Tahoe and then later a

22  Toyota Tacoma, which he still drives today.  I never knew Peter to take any
expensive vacations or to eat out at expensive restaurants.  Peter did not

23  wear expensive clothes, stay in exclusive hotels or do anything that would be

24  out of the norm for someone leading a middle-class lifestyle.  As long as I have
known [him], he has lived a modest lifestyle and lived within his means."

25

26  [12]  *See, e.g., United States v. Autery*, 555 F.3d 864 (9th Cir. 2009)
(affirming downward variance from 41-51 months to straight probation for

27  child pornography offense where defendant did not fit the profile of a
pedophile, had no history of substance abuse, no interpersonal instability,

28  was motivated and intelligent, and had continuing family support).

1    The recommended sentence would provide sufficient retribution in this

2    case.  Peter Townsley has already been punished greatly.  He was arrested in

3    this case over two years ago.  PSR ¶ 16.  This was the first time he had ever

4    been arrested, and he remained imprisoned for almost a week.  The life he

5    knew was forever changed.  Indeed, he had already been punished by the

6    demise of CLF as a consequence of the CDFA's 2006 direction that Biolizer

7    XN was non-compliant and must be removed from the market.  Closing CLF

8    was heart-breaking for him.  As stated in his letter to the Court, "I spent

9    more than 20 years developing this technology and now needed to sell the

10   technology in order to avoid potential bankruptcy."

11       Peter Townsley's sister, Beth Ostlund, writes:

12       "What Peter has experienced already is a horrific price to pay.  He

13       has been humiliated and harshly treated during his arrest, has

14       been unable to work since October 2010 . . . his parents will never

15       be the same, he has had to use all his savings to pay for legal

16       representation, his family name has been splashed all over the

17       internet, he'll loose access to the USA and will live with a record

18       forever. . . .  He has been punished enough. . . .  He will take no

19       chances that laws could be broken and will never be in this

20       terrible position again."

21   *See also* Letter from Donald Le ("He made a mistake and so far [is] paying

22   dearly for it.  We have seen how much Peter suffers over that last couple

23   years, and we don't think Peter will ever in his life violat[e] the law again.").

24       Additionally, the punitive nature of a sentence of imprisonment

25   imposed by the Court will be increased by Mr. Townsley's age (51).  While

26   fifty-one is not old in the outside world, the average age of federal offenders is

27

28

just thirty-five.[13]  As stated by the Eighth Circuit, a defendant's age at 51 "can and should be considered" in sentencing.[14]  Problems suffered by older inmates accelerate the aging process, and first-time offenders over 50 are particularly "easy prey" for more experienced predatory inmates.[15]  Older inmates have a higher rate of depression than do younger inmates, including even a "higher rate of successful suicide."[16]  They also suffer more from prisons' lack of privacy, noise, and brisk pace.[17]

In sum, Peter Townsley already has been punished greatly, and a term of imprisonment will have an extremely punitive effect upon him.

### 2.    Specific Deterrence

The recommended sentence is consistent with specific deterrence.  The Probation Officer "does not believe that Townsley is at risk to commit further offenses."  PSR Sentencing Recommendation, p. 2.  Peter Townsley confirms in his letter to the Court, "I can assure all involved that I have learned a very painful lesson and I will never run afoul of the law again."

The Probation Officer's assessment and Mr. Townsley's commitment are reflected in many letters submitted to the Court.  As stated by his cousin,

---

[13]  *See* Overview of Federal Criminal Cases, FY 2011, at 3, at: http://www.ussc.gov/.

[14]  *United States v. White*, 506 F.3d 635, 640 (8th Cir. 2007)*; see also United States v. Ruiz*, 2006 WL 1311982 at * 4 (S.D.N.Y. 2006) (collecting below-Guideline sentences imposed on defendants over 40 based on reduced recidivism) (unpublished).

[15]  U.S. Department of Justice, Nat'l Institute of Corrections, Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates (2004), at: http://nicic.gov/library/018735.

[16]  U.S. Bureau of Prisons, Management of Major Depressive Disorder, at 2 (August, 2009), at: www.bop.gov/news/PDFs/depression.pdf.

[17]  *See* Ronald H. Aday, Aging Prisoners: Crisis in American Corrections (2003).

Gail Townsley, "On many occasions, Peter has expressed remorse for his actions and accepts responsibility for his offense. I believe that he will never do anything unlawful again." His cousin, Brian Townsley states, "I am confident from our many discussions that he has learned his lesson. Peter has never been in trouble with the law in the past. I believe that he will never be in trouble with the law again and is not a danger to society." His former transactional lawyer, Patrick Casey, states, "I have no doubt that Peter has learned his lesson from the current circumstances. . . . He is not a recidivist."

In addition to the many personal indicia that Mr. Townsley will not run afoul of the law again, he also is an unlikely recidivist based on objective measures used by the Sentencing Commission in evaluating recidivism. These include his lack of a prior criminal record (CH I, zero criminal history points), age (over 50), stable employment during the year prior to the instant offense, high level of education, marital status, lack of illicit drug use, and the nature of the offense.[18] *See* PSR ¶¶ 46-47, 51-56. Probationary sentences, and probation combined with alternative confinement, also correlate with substantially lower recidivism rates than sentences of straight prison.[19]

In sum, no further punishment is needed to deter Mr. Townsley from breaking the law again.[20]

---

[18] *See* Research Series on the Recidivism of Federal Guideline Offenders, Measuring Recidivism: The Criminal History Computation of the Sentencing Guidelines, at pp. 11-13, at: http://www.ussc.gov/Research/Research_Publications/Recidivism/200405_Recidivism_Criminal_History.pdf.

[19] *Id.*, at p. 13.

[20] *See, e.g., United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (the "need for further deterrence and protection of the public is lessened because
(continued...)

3. General Deterrence

The recommended sentence is sufficient to serve the purposes of general deterrence. The OFPA was enacted over 20 years ago, and the USDA has been administering the National Organic Program for over a decade. Yet, it appears that only two other federal criminal cases have been brought based on violations by fertilizer manufacturers.[21] Accordingly, it does not appear that there is a pressing need to send a message to potential violators through the sentence imposed in this case. Moreover, the charges in this case, and Peter Townsley's conviction alone, have reverberated throughout the organics industry.[22]

Additionally, the offense in this case differs greatly from typical fraud offenses, which ordinarily are harder and more costly to detect. As to such offenses, deterrence through the message sent by one individual's sentence may be a crucial part of overall enforcement. This case stands in stark contrast. The composition of a fertilizer can be tested in an agricultural laboratory. Ensuring that fertilizer labeled as 'organic' in fact meets regulatory standards can be achieved in a routine way. In contrast, offenses like insider trading, embezzlement, bank fraud, Ponzi schemes and money laundering typically are challenging and costly to detect. "Sending a message" through sentencing has an important role in such cases that is not present to the same degree in this case.

---

[20](...continued)
the conviction itself already visits substantial punishment on the defendant").

[21] *United States v. Nelson*, 11-cr-96 (E.D. Cal.) (sentencing pending); *United States v. Chase*, 11-cr-60133 (D. Or.) (27 months imposed on plea).

[22] Dozens of articles have appeared in organics industry publications on the internet.

1    Finally, the level of punishment generally needed to meaningfully deter

2    any type of fraud is not known.[23]  However, it probably is fair to assume that

3    most middle-aged businessmen greatly fear serving any term of

4    imprisonment.[24]  This further supports the conclusion that the recommended

5    sentence likely would be "sufficient, but not more than necessary" (18 U.S.C.

6    § 3553(a)) to satisfy the purpose of general deterrence in this case.

7              4.      Rehabilitation

8         "[A] court's duty is always to sentence the defendant as he stands before

9    the court on the day of sentencing" *Pepper v. United States*, 131 S. Ct. 1229,

10   1242 (2011) (citation, quotation omitted).  The offense conduct in this case

11   concluded over half a decade ago - in December, 2006.  Mr. Townsley sold

12   CLF's facility, assets and technology in 2007.  He has led a wholly law-

13   abiding life since that time, and has had no further involvement in

14   commercial organics.  The recommended sentence would enable him to

15   continue to lead a life of rehabilitation he has been living for many years

16   now.[25]

17

18

_____

19   [23]   Despite the important role assigned to deterrence in sentencing, "we do
     not have very solid and credible empirical evidence that deterrence through
20   the imposition of criminal sanctions works very well." Raymond Paternoster,
     Crimes and Punishment: How Much Do We Really Know About Criminal
21   Deterrence?, 100 J. Crim. L. & Criminology 765, 766 (2010).
22
     [24]   *See United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006)
23   ("even relatively short sentences can have a strong deterrent effect on 'white
     collar' offenders"), *citing* Richard Frase, Punishment Purposes, 58 Stan. L.
24   Rev. 67, 80 (2005); Elizabeth Szockyj, Imprisoning White-Collar Criminals?,
     23 S. Ill. U. L. J. 485, 492 (1998).
25
26   [25]   *Cf. Pepper*, 131 S. Ct. at 1242 (post-sentencing rehabilitation evidence
     may be highly relevant to several § 3553(a) factors, such as the most
27   up-to-date picture of "history and characteristics" and the likelihood of
     engaging in future criminal conduct).
28

Community service in the field of organics, a part of the recommended sentence, would advance his knowledge and awareness and further assure his rehabilitation.  As stated by Maury Treleven, a former long-time employee of Peter Townsley:

> "Mr. Townsley is a creative, kind, and a patient man. He is an intelligent and educated man.  His skill set and background in engineering, agriculture, manufacturing, and science are of tremendous value.  He is a man who has many things to offer. . . . I hope that in considering the appropriate consequences for the actions of Mr. Townsley you will consider what might be gained by asking him to 'make it right' in a way that is creative and useful.  Ask yourself what might be gained in the form of justice for society by paying his debt through use of his time, talent and treasure.  What might be gained personally by Mr. Townsley in the form of humility and forgiveness through performing acts of service that have the potential to lift up and transform the lives of those who suffer from many kinds of injustice?"

Additionally, the close support of Peter Townsley's many family members supports leniency as it will further assure his enduring rehabilitation.  *See United States v. Martin*, 520 F.3d 87 (1st Cir. 2008) (affirming 91-month downward variance based in part on "the support that the defendant stood to receive from his family [and] personal qualities indicating his potential for rehabilitation").

Finally, Peter Townsley's rehabilitation is further evidenced by his scrupulous compliance with the conditions of his release on bond.  His integrity is reflected in his validation of the trust placed in him by the Court in permitting him to travel to and from Canada during the pendency of these proceedings.  *See* PSR ¶ 5.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

D.     *The Kinds of Sentences Available*

Since the Supreme Court's decision in *Booker*, the Guidelines are merely advisory, thereby freeing this Court to tailor an appropriate punishment in light of numerous concerns.  This Court is fully empowered to exercise sentencing leniency as no mandatory minimum applies in this case.

E.   *A Guideline Sentence Would be Disproportionate to the Offense and Inconsistent With the Purposes of Sentencing*

Sentencing courts must consider, but are not bound by, the applicable sentencing range. The Supreme Court has repeatedly noted that sentencing courts should not presume that a Guideline term is reasonable.[26] "Nor should the Guidelines factor be given more or less weight than any other. While the Guidelines are to be respectfully considered, they are one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (*en banc*).[27]

Section 3553 of Title 18, "as modified by *Booker*, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to achieve the goals of sentencing." *Kimbrough*, 552 U.S. at 101. Although this case certainly presents highly unusual facts and circumstances, "extraordinary circumstances are not needed to justify a sentence outside the guidelines range." *United States v. Ruff*, 535 F.3d 999, 1002 (9th Cir. 2008) (affirming variance from 30-37 month Guideline to supervision with the requirement that defendant serve 12 months and one day at a supervised release center for conviction of health care fraud, embezzlement and money laundering).

In considering what weight to give the Sentencing Guidelines in this case, it may be worth considering that the Guidelines were originally

---

[26]   *See Nelson v. United States*, 555 U.S. 350, 351-52 (2009); *Gall v. United States*, 552 U.S. 38, 50 (2007); *United States v. Rita*, 551 U.S. 338, 351 (2007); *Kimbrough v. United States*, 552 U.S. 85, 90, 111 (2007).

[27]   *See also Gall*, 552 U.S. at 59 ("Guidelines are only one of the factors to consider when imposing sentence."); *Kimbrough*, 552 U.S. at 90 (although "formerly mandatory, [they] now serve as one factor among several courts must consider in determining an appropriate sentence.").

designed to moderate unwarranted disparities in federal sentencing by establishing a set of rules that, it was hoped, would cause sentencing courts to impose for any given crime a sentence approximately equal to what empirical data showed was the average sentence previously imposed by federal judges for that crime. *See generally Kimbrough*, 552 U.S. at 96.  At the time the Guidelines were enacted, the Organic Food Production Act had not been enacted, nor had the USDA established the NOP.  No case like this was first brought until this case was filed approximately 23 years after the Guidelines were enacted.  In contrast to the majority of 'white collar' crimes (bank fraud, false statements, securities fraud, mortgage fraud, tax evasion, *etc.*), the Sentencing Guidelines clearly were not adopted with cases such as this in mind, nor were they based on any empirical data about how courts sentenced such violations.

Similarly, it may merit consideration that this case stands in stark contrast to the major frauds like Enron and WorldCom that have caused the Sentencing Commission to increase fraud guidelines over the years.  If Mr. Townsley were sentenced in 1987, his offense would have generated a total adjusted offense level of 17 (24-30 months).[28]  Is the conduct so much worse today?  Does it make sense to sentence him in accordance with a more punitive schedule that was adopted by the Sentencing Commission largely in response to massive frauds?

Finally, Guideline Section 2B1.1 reportedly applies to more than 300 federal criminal statutes.[29]  Such a broad range supports giving relatively

---

[28] *See* U.S. Sentencing Guidelines (Oct. 1987) §§ 2F1.1(a) (base +6), (b)(1)(K) (loss +10), (b)(2) (+2 planning/# victims), 3B1.1(c) (+2 role), 3E1.1(b)(2) (-3 acceptance).

[29] *See* Alan Ellis, John R. Steer, and Mark H. Allenbaugh, At a "Loss" for Justice - Federal Sentencing for Economic offenses, American Bar Ass'n,

(continued...)

greater weight to the specific facts and circumstances at issue than to the calculated Guideline range, in order to avoid imposing comparable sentences for starkly differing crimes.  Perhaps recognizing this phenomenon, in Fiscal Year 2011, sentencing courts made non-5K downward departures/variances in 22.6% of all fraud cases nationwide, including those in which the defendant was convicted following trial.[30]  In this case both the offense conduct and offender greatly differ from the typical Section 2B1.1 case, thus warranting giving relatively less weight to the Guideline.

F.   *The Sentencing Commission's Policy Statements*

The weight to be given the Sentencing Commission's policy statements in post-*Booker* sentencing has not been quantified.  However, in a recent survey, large majorities of judges informed the Sentencing Commission they believe that mitigating factors deemed "not ordinarily relevant" in the Guidelines should be "ordinarily relevant" to their consideration of departures/variances.[31]  These include, in relevant part, age, education, employment record, and family ties and responsibilities.  *Id*.  Other factors that large majorities believed should be "ordinarily relevant" were post-offense rehabilitation (70%) and aberrant behavior (75%).  *Id*.  Many also informed the Commission that when exercising sentencing leniency they did not rely on Guideline departures for reasons that would make sense in this

---

[29](...continued)
*Criminal Justice*, V. 25, No. 4, at 38 (Winter 2011).

[30]   *See* USSC Statistical Information Packet FY 2011 (9th Cir.), at 19, at: http://www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/State _District_Circuit/2011/index.cfm.

[31]   USSC Results of Survey of United States District Judges January 2010 through March 2010, Table 13 (2010), at: http://www.ussc.gov/Research/Research_Projects/Surveys/20100608_Judge_S urvey.pdf.

1   case: the Guidelines do not contain a departure provision adequately
2   reflecting the reasons for a sentence outside the range (76%), the policy
3   statements in the Guidelines are "too restrictive" (65%), and "Departure
4   policy statements are inconsistent with the factors under 18 U.S.C. § 3553(a)"
5   (41%).  *Id.*, Table 14.

6          The grounds supporting leniency in this case are many and varied.
7   Accordingly, while the Court must consider the Guidelines' Policy
8   Statements, the defense suggests a variance is appropriate based on the
9   cumulative effect of numerous factors which do not precisely fit within the
10  Guidelines' framework.[32]

11         G.      *The Recommended Sentence Would Avoid Unwarranted*
12                 *Sentencing Disparities*

13         The recommended sentence recognizes the unique facts and
14  circumstances in this case.  The disparity between the recommended sentence
15  and the Guideline range is warranted by the many sympathetic and unusual
16  factors identified in the Presentence Report and the accompanying letters to
17  the Court.  Imposing the recommended sentence also would be consistent
18  with sentencing patterns in fraud cases in this District and nationwide.

19         Courts in the Northern District of California imposed split sentences,
20  community confinement and/or probation in 38.1% of all fraud cases,
21  including those sentenced after trial convictions, for Fiscal Year 2011, and the

22
23
24

---

25   [32]   In considering Guidelines' Policy Statements, the Court should look to
     the Guidelines applicable at the time of the offense (Nov. 2006), and not the
26   current Guidelines.  Although there are no *ex post facto* issues in using the
     current Guidelines manual to calculate the Adjusted Offense Level (PSR ¶
27   23), the Policy Statements in today's Guidelines have language not first
     adopted until November, 2010 which could discourage sentencing outside of
28   the Guidelines notwithstanding 18 U.S.C. § 3553 and *Booker* and its progeny.

figure was 28.6% nationwide.[33]  In light of the mitigating and unusual facts in this case, the recommended sentence appears consistent with this sentencing data.

Finally, the disparity between the potential punishment in this case and that provided by more specific current California laws also might be considered.  California laws and regulations regarding fertilizer, including adulterated or mislabeled organic fertilizer, provide for a misdemeanor conviction and fine for the most serious and/or repeated violations.[34]

H.    *The Parties Agree That No Restitution is Owed*

An additional unusual fact in this case is the agreement of all parties that no restitution is owed.  PSR ¶¶ 4, 18.  Purchasers of Biolizer XN, the victims in this case, did not sustain any permanent pecuniary harm because

---

[33]  *See* USSC Statistical Information Packet FY 2011 (N.D. Cal.), Tables 4 and 5, at:
http://www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/State_District_Circuit/2011/index.cfm.

[34]  See Cal. Food & Agric. Code §§ 14592, 14602 (both stating a violation "is an infraction punishable by a fine of not more than five hundred dollars ($500). A second or subsequent violation . . . is a misdemeanor punishable by a fine of not less than one hundred dollars ($100) and not more than one thousand dollars ($1,000)."), 14651(a) ("Unless otherwise specified in this chapter, any violation of this chapter, or the regulations adopted pursuant to this chapter, is a misdemeanor, punishable by a fine of not more than one thousand dollars ($1,000) for the first violation and not less than one thousand dollars ($1,000) for each subsequent violation."), 14651.5 (providing for "a civil penalty against any person who violates this chapter in an amount of not more than five thousand dollars ($5,000) for each violation."), 14652(b) ("It is unlawful for any person to adulterate . . . any fertilizing material with the result that the fertilizing material would be inconsistent with the label claims.  Any violation of this subdivision is a misdemeanor punishable by a fine . . . [of not] less than fifteen thousand dollars ($15,000) for each knowing violation."); Cal. Code Reg. § 2322(a)(B) ("Violations that cause significant false, misleading or deceptive business practices that involve the misbranding, adulteration of fertilizing material products . . . are punishable by a civil penalty of up to five thousand dollars ($5,000).").

they sold their produce as organic, thereby recouping the differential paid to CLF. The absence of pecuniary harm makes this an atypical fraud case, and further supports leniency.[35]

**IV.     Multiple Grounds Support a Variance Under 18 U.S.C. § 3553**

A.     *Peter Townsley's Family Ties and Responsibilities Weigh in Favor of the Recommended Sentence*

Peter Townsley's parents, Phillip and Marion, are elderly and are in failing health, as reflected in their physician's accompanying letter. Exh C; *see also* PSR ¶ 43-44. Phillip Townsley is 87 years old, and has already suffered one heart attack. Marion Townsley recently spent 11 days in the hospital after losing consciousness. Peter Townsley has been caring for his parents during the pendency of this case while allowed to live in Canada. The pain he has caused his family weighs heavily upon Mr. Townsley, and he is in fear for his father's health. As explained in his letter to the Court:

". . . I have a wife, two stepchildren, nieces, nephews, aunts, uncles and cousins as do most people, all of which are law abiding and productive members of society. One can imagine the shock and disbelief my arrest had on my family in October 2010. It was a situation that neither I nor anyone in my family has had any

---

[35] *Cf. United States v. Armstead*, 552 F.3d 769, 782 (9th Cir. 2008) (a loss that is reimbursed immediately does not amount to a pecuniary harm because the ultimate loss cannot be measured in monetary terms); *United States v. Pham*, 545 F.3d 712, 720-21 (9th Cir. 2008) (remanding for resentencing where enhancement was not supported by evidence that 50 or more persons suffered actual loss in the form of pecuniary harm); *United States v. Kennedy*, 554 F.3d 415, 419 (3d Cir. 2009) (account holders from whose accounts defendant stole funds were not victims where they were reimbursed before knowing funds were missing and therefore suffered no pecuniary or other harm); *United States v. Conner*, 537 F.3d 480, 488-89 (5th Cir. 2008) (credit account holders whose account numbers were used to make fraudulent purchases suffered no pecuniary harm and thus were not victims because they were promptly reimbursed by credit card companies).

experience with.  The situation has been surreal and very stressful.  The ongoing stress of this situation has greatly affected the health and well being of my family and I worry constantly about the effect this has had on my father. . . .  As I approach sentencing, I am mostly worried for the health of my elderly parents and for the welfare of my wife and my stepchildren."

His father, Phillip Townsley, who is 87 years old, states:

"I do not need to tell you that his arrest was very difficult for his mother and me. . . . [The] circumstances surrounding this case are totally inconsistent with Peter's character and I have never known him to be anything but respectful and honest.  I want to express my thanks to you for allowing Peter to travel to Canada. Each time he was able to travel up here he helped me with many home repairs and helped his mother in the kitchen."

Peter Townsley's mother, Marion Townsley, writes:

"This has been extremely difficult time for my husband.  He is under tremendous stress and constantly worries about his son. He is under the care of several specialists who are doing their best to help him."

*See also* Letters from Peter Townsley's aunt, Anne MacIntosh;[36]

---

[36] "[Our] whole family is concerned over the health of my older brother Philip, who is Peter's father.  Philip is now 86 years old, and recently had a stress related collapse and is currently under medical care. . . .  I know that a custodial sentence would have a devastating effect both on Peter and his family, and I therefore ask for your understanding and leniency in this case."

aunt and uncle, Patricia and David Townsley;[37] sister, Beth Ostlund;[38] and

cousin, Gail Townsley.[39]

Mr. Townsley also supports his spouse, Lorena Townsley, and two

step-children, Hector and Estefania, and contributes to the support of his

mother-in-law, Carmen Violeta-Rincon, and sister-in-law, Arbelis Rincon.

His devotion to these family members is reflected in their letters to the Court.

Writes Lorena Townsley:

> "We have a small home in Guadalajara, and my mother, younger
>
> sister and children live there with us.  He takes care of all of my
>
> family members as if they have always been his own. . . .  Peter is
>
> a very kind, hard working and enterprising man.  He always puts
>
> family first. . . . His parents are older and he always helps them
>
> in any way he can. "

Peter Townsley's mother-in-law, Carmen Violeta-Rincon writes:

> "Peter is kind and helpful to other people.  Since joining our
>
> family, he has always been helpful and treated others with

---

[37]  "This tragedy has taken its toll on Peter and his family.  His father, Dr.
Philip Townsley, feels 'responsible' for helping Peter develop this process.  He
has deteriorated both physically and mentally because of the strain . . . ."

[38]  "When Peter was arrested on Thanksgiving October 2010 my family
was in shock and disbelief.  These are foreign words to us never heard before.
. . . [The] family, especially our mother and father were and still are
devastated. . . . Our parent's aging has rapidly accelerated. . . . Imprisonment,
I'm afraid will kill my parents spirit and will to carry on.  They are hurting
for Peter, the son they admire so much. . . ."; "Every opportunity Peter has
had when on bail, he has spent being with our mother and father. . . . He has
been trying his best to care for them through the trauma that they've been
thrown into.  I know Peter feels horrible that this has hit his family, as he is
family focused and only wishes the best for all of us."

[39]  Peter Townsley is "worried, not so much about himself, but more about
what his situation was doing to his parent's health."

decency.  He has provided unconditional support at all times and
our quality of life has improved.  Our entire family misses Peter
and I ask you the opportunity to have compassion if he committed
any error."

*See also* Letter from Hector Perez Lopez.[40]

In sum, the sentence imposed will punish Peter Townsley all the more
because of his family's suffering, and his family will also suffer from the
sentence imposed.  These considerations further support the recommended
sentence

B.     *Collateral Immigration Consequences – Deportation, Harsher*
       *Conditions of Confinement, and Potential Additional Detention –*
       *Support Sentencing Leniency*

Peter Townsley faces four adverse effects of his conviction that would
not be suffered by an otherwise equally-situated citizen who committed the
identical offense.

First, Mr. Townsley faces removal notwithstanding the many years that
he lawfully resided in this country, close family members who live here, and
ownership of property in the United States.[41]  The Probation Officer states:

"[A] Canadian citizen, [he has] held an E-2 visa, which allows an
individual to enter and work inside of the United States, based on

---

[40]   Describing his step-father as an "honest and hardworking person . . . .
Although not my biological father, Peter Townsley has been supporting my
family and me with respect to our food, health care and education, and in my
case this enabled me to finish my studies in international trade and
commerce.  I am truly grateful to this honorable person."

[41]   The Immigration and Nationality Act (8 U.S.C. §§ 1101-1537) sets forth
six categories of deportable offenses (8 U.S.C. § 1227(a)(1)–(6)), including
offenses coming within the definition of an "aggravated felony," which
includes any fraud offense involving a loss exceeding $10,000.  *See* 8 U.S.C. §§
1101(a)(43)(M)(1), 1227(a)(2)(A)(iii).

an investment he was controlling.  Because of his conviction in this case, and the demise of his company, CLF, it appears Townsley will be removed from the United States, despite the fact he owns property in the United States and has family members and friends, including his cousins and an aunt and uncle, in this country."

PSR ¶ 47.  The loss of Peter Townsley's visa will impose substantial penalty on him.  He states:

> "Over the past 20 years I have developed many friendships and
> have spent the majority of my working career in the United
> States.  It therefore saddens me to realize that the decisions I
> made 10 years ago will prohibit my entry to what I had become to
> know as my home."

While not technically "punishment," being removed from this country is a painful and life-long adverse consequence of his conviction that would not be suffered by an otherwise equally-situated citizen.[42]

Second, as a noncitizen, Mr. Townsley could face harsher conditions of confinement than a citizen who otherwise is identically situated because the Bureau of Prison (BOP) does not permit noncitizens to serve their terms in a minimum security facility, the lowest security designation for federal

---

[42]   *See Jordan v. De George*, 341 U.S. 223, 232 (1951) (Jackson, J., dissenting) (describing deportation as "a life sentence of banishment in addition to the punishment which a citizen would suffer from the identical acts.").

1    prisons.[43]  Rather, BOP policy mandates placement of noncitizens such as Mr.

2    Townsley in no less than low security facilities.[44]

3          Third, Congress has directed that the BOP "shall, to the extent

4    practicable" place a prisoner in a facility that enables community

5    readjustment, such as a halfway house, for up to one year at the end of his

6    term. 18 U.S.C. § 3624(c)(1).  However, an ICE detainer would render Mr.

7    Townsley ineligible for such end-of-sentence confinement because it would

8    mandate confinement in at least a low-security facility.[45]  These more severe

9    restrictions are a basis for the Court's exercise of leniency.[46]

10   _____

11   [43]  "Minimum security institutions, also known as Federal Prison Camps

12   (FPCs), have dormitory housing, a relatively low staff-to-inmate ratio, and
     limited or no perimeter fencing . . . [and] are work- and program-oriented. . .

13   ." Prison Types & General Information, U.S. Dept. of Justice, Fed. Bureau of
     Prisons, at: http://www.bop.gov/locations/institutions/index.jsp. On the other

14   hand, "[l]ow security Federal Correctional Institutions (FCIs) have
     double-fenced perimeters, mostly dormitory or cubicle housing, and strong

15   work and program components.  The staff-to-inmate ratio in these

16   institutions is higher than in minimum security facilities." *Id.*

17   [44]  U.S. Dept. of Justice, Fed. Bureau of Prisons, Program Statement No.
     P5100.08, Inmate Security Designation and Custody Classification, Ch. 5, at

18   9, at: www.bop.gov/policy/progstat/5100_008.pdf.

19   [45]  *See id.; United States v. Smith*, 27 F.3d 649, 651, n. 2 (D.C. Cir. 1994)

20   (downward departure may be appropriate where defendant's deportable alien
     status may cause increased severity of confinement; Guidelines' ban on

21   considering national origin is not obstacle to leniency for deportable

22   noncitizens who suffer more severe confinement because of such status).

23   [46]  *See United States v. Charry Cubillos*, 91 F.3d 1342 (9th Cir.1996)

24   (remanding to consider if downward departure is warranted based on alien's
     ineligibility for minimum security facility and community confinement);

25   *United States v. Davoudi*, 172 F.3d 1130, 1133-34 (9th Cir. 1999) (sentencing

26   court had discretion to depart downward in bank fraud case because
     deportable aliens may be unable to take advantage of the up to six months of

27   home confinement authorized by 18 U.S.C. § 3624(c)); *United States v.

28   Lopez-Salas*, 266 F.3d 842 (8th Cir. 2001) ("[t]o the extent . . . cases suggest

                                                              (continued...)

1   Fourth, immigration authorities will take Mr. Townsley into custody at

2   the conclusion of his detention.[47]  He may be incarcerated by immigration

3   authorities for weeks or possibly even months after the sentence imposed by

4   the Court.[48]  This incarceration would be in addition to the sentence imposed

5   by the Court because the BOP does not credit immigration detention towards

6   the term imposed.[49]

7   C.   *Others' Unlawful Conduct Contributed to the Offense*

8   Peter Townsley fully accepts responsibility for his wrongdoing.  He has

9   pled guilty to a serious crime, and admits fault.  However, the actions of

10  others merit consideration so that the violation is viewed in context.

11

12

13   [46](...continued)

14  that factors related to alien status may never be a basis for departure, they
    are inconsistent with *Koon*, which made it clear that courts may not declare

15  what sentencing factors are inappropriate in every circumstance.").

16   [47]  *See* 8 U.S.C. § 1226(c)(1) ("The Attorney General shall take into custody

17  any alien who . . . is deportable by reason of having committed any offense
    covered in section 1227(a)(2)(A)(ii) . . . (A)(iii) [aggravated felonies] . . . . of this

18  title . . . .").

19   [48]  *See* Transcript of Public Hearing at 33-34, U.S. Sentencing Comm'n

20  (Jan. 20, 2010) (testimony of John T. Morton, Asst. Sec'y of Homeland Sec. for
    ICE) (a "large number"of deportable federal inmates are held in immigration

21  custody, which can be from "40 days to months, in very rare instances,

22  years."), at:
    http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Me

23  etings/20100120-21/Agenda.html.

24   [49]  U.S. Dept. of Justice, Fed. Bureau of Prisons, Program Statement No.

25  5880.28, Change Notice Sentence Computation Manual 1-15A (1997)
    ("Official detention does not include time spent in the custody of the U.S.

26  Immigration and Naturalization Service (INS) under the provisions of 8

27  U.S.C. § 1252 pending a final determination of deportability."), at:
    www.bop.gov/policy/progstat/5880_028.pdf.

28

Certifiers contributed to Mr. Townsley's offense through their own violations of the law.  During the time period relevant to this case, growers and certifiers should not have been relying on OMRI Listing to determine compliance with NOP regulations. Those who relied on OMRI Listing to determine compliance with NOP regulations were skirting the law, and in fact were cited by the USDA when they were caught, as this Court has previously found. *See* Order at CR 56, at pp. 5-6 ("[C]ertifying agents were not supposed to use OMRI Listing as a substitute for their obligation to determine whether a farming input was permissible under federal law. . . . The product Townsley allegedly lied about was not regulated. . . .  Indeed, certifying agents were cited for wrongful conduct in USDA Audits for using OMRI Listing as a substitute for an independent determination of whether an input was on the approved National List.").

The victims in this case were sophisticated commercial ventures, and not gullible victims as in many federal fraud prosecutions.  They would not have been deceived if certifiers had not violated the law by relying on Mr. Townsley's misrepresentation that Biolizer XN was OMRI Listed, and if they had not relied on OMRI Listing.  This observation should not be taken to suggest that Mr. Townsley is not accepting full responsibility for his conduct. Mr. Townsley has admitted and pled guilty to misrepresenting that he had properly obtained OMRI Listing for Biolizer XN and mislabeling the product, and he fully acknowledges his culpability.  However, the misconduct of certifiers and growers substantially distinguishes this case from fraud cases involving wholly-innocent victims.

D.    *Overstatement of "Loss" Under USSG § 2B1.1*

The defense accepts the Court's determination of the "loss" amount under Section 2B1.1(b)(1) of the Guidelines, and Peter Townsley has acknowledged that the offense conduct occurred over a number of years and

involved a number of victims, as stated in the Presentence Report.
Nonetheless, the defense submits that the Guideline "loss" in this case
overstates Mr. Townsley's culpability.

In contrast to most cases involving a "loss" calculation under Section
2B1.1, in this case (1) no victim sustained any permanent pecuniary harm
(*see* PSR ¶ 18 ("The USDA agent indicated that although there are
approximately 44 known victims, there is no identified restitution amounts
(in part because the farmers sold the product as organic, thereby capturing
organic prices for their produce).")); (2) no victim suffered demonstrative non-
pecuniary harm; and (3) Mr. Townsley's personal gain was low as evidence by
the accounts of many who describe his modest lifestyle.

Additionally, applying the "loss" table in this case would generate a
disproportionate sentence relative to notorious white-collar offenders whose
crimes caused far greater harm.  In this case, the Guideline "loss" is
$2,518,645 (PSR ¶ 27), which generates a Guideline range of 63-78 months.
A low-end term would equate to a month of imprisonment for each
approximately $40,000 of loss.  This would be a *far* harsher penalty than the
comparative penalty imposed on infamous offenders such as Bernard Madoff
and Bernie Ebbers (both received a month of imprisonment for each $36
million in "loss"), Ronald Ferguson ($20 million/month), Marc Dreier ($2.9
million/month), Joseph Nacchio ($388,889/month) and Jeff Skilling
($277,778/month) - among many others.[50]

---

[50]   *See* Alan Ellis, John R. Steer, and Mark H. Allenbaugh, At a "Loss" for
Justice, *supra* note 29, at 38 (Winter 2011).  Many commentators have
criticized the "loss" table on these and other grounds.  *See id.*, at 36 (although
"loss" is a "critical determinant" in sentencing economic crimes, it does not
consider many important factors, including "the scienter of the offender");
Frank Bowman, Sacrificial Felon, The American Lawyer (Jan. 2007), at 63
(Guidelines for "federal white-collar sentences are now completely untethered
(continued...)

Would it make sense to sentence Peter Townsley proportionally to Richard Harkless, who was sentenced to a month of imprisonment for each $32,500 of loss,[51] and was the remorseless operator of a $60 million Ponzi scheme who owed over $35 million in restitution to victims, some of whom lost their retirement savings and college funds?  Yet, that is precisely what a Guideline sentence would do in this case would do.  Similarly, could a Guideline sentence in this case be reconciled with the 24-month sentence recently imposed, following a trial conviction, on Raj Gupta - a former Goldman Sachs inside tipper whose securities fraud and conspiracy violations involved a 2B1.1(b) adjustment identical to that in this case (+18 levels), *and* who abused a position of trust as a fiduciary of his employer,[52] *and* who the government contends should be ordered to pay over $6 million in restitution?[53]

As stated in testimony before the Sentencing Commission by Second Circuit Judge Jon O. Newman, the Guidelines' reliance on an incremental approach to culpability based on dollar amounts "create[s] an illusion of precision that is divorced from reality" and makes "no penological sense,"

---

[50](...continued)
from both criminal law theory and simple common sense"); Andrew Weissmann & Joshua Block, White-Collar Defendants and White-Collar Crimes, 116 Yale L.J. Pocket Part 286 (2007) ("Federal Sentencing Guidelines for fraud and other whitecollar offences are too severe" and are greater than "necessary to satisfy the traditional sentencing goals of specific and general deterrence - or even retribution").

[51]   *See id.,* At a "Loss" for Justice, at 38.

[52]    *See* 11-cr-907 (S.D.N.Y., Oct. 24, 2012), Dkt. 127 (Sentencing Order).

[53]   *Id.*, Dkt. 124 (Gov't Brief).

since it may not facilitate a reasoned appraisal of culpability.[54]  Finally, by placing disproportionate weight on "loss," Section 2B1.1 appears inconsistent with the statutory mandate that many factors be considered in fashioning an appropriate Guideline.  *See* 18 U.S.C. § 3553(a).[55]

In light of the preceding, the defense respectfully submits that an individualized assessment in this case would support a finding that the applicable +18 Guideline "loss" adjustment overstates Mr. Townsley's culpability.

## V.   Conclusion

Peter Townsley is a kind, modest and hard-working person who has learned his lesson and will not run afoul of the law again.  He has accepted responsibility for his wrongdoing and apologizes.  He led a wholly productive, law-abiding and family-oriented life before the offense in this case, and has lived such a life for over half a decade since it concluded.  He already has been punished, and the sentence imposed by this Court will have grave, lifelong consequences for him and his family - including, in particular, his elderly and ailing parents.  The interests of general deterrence have already been served,

[54]   U.S. Sentencing Commission Public Hearing Testimony and Transcripts (July 9, 2009) (Statement of Judge Jon O. Newman), at: http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Me etings/20090709-10/Agenda.htm.

[55]   Perhaps recognizing such issues, the Sentencing Commission recently gave notice of priorities including "Continuation of its work on economic crimes, including (A) a comprehensive, multi-year study of 2B1.1 . . . and related guidelines, including examination of the loss table and the definition of loss, and (B) consideration of any amendments to such guidelines that may be appropriate in light of the information obtained from such study." 77 Fed. Reg. 101, pp 31069-70 (May 24, 2012), at: http://www.gpo.gov/fdsys/pkg/FR-2012-05-24/html/2012-12599.htm.

1  and the interests of proportionality and avoiding sentencing disparities

2  further support leniency.

3          In light of the preceding, the defense respectfully requests that the

4  Court impose the sentence recommended by the Probation Officer based on

5  the unusual and mitigating facts and circumstances in this case, and the

6  combination of them.

7  Dated:___10/31/2012___          Signed:____/s/ *Evan A. Jenness*___

8

9  Dated:___10/31/2012___          Signed:____/s/ *William J. Genego*___

10                                              Attorneys for Peter Townsley

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28